No. 22-1507

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

LIDIA LECH,

*Plaintiff-Appellant*,

*v.*

DOROTHEA VON GOELER, MD; BAYSTATE MEDICAL PRACTICES, INC.; HAMPDEN COUNTY SHERIFF'S DEPARTMENT; MARIA DIAZ; NICOLE SKORUPSKI; ELIZABETH MEAUX; SHANTELLE ROSADO; JULIE BELLE-ISLE, RN; LYNN CHASE; MICHAEL J. ASHE, JR.; PATRICIA MURPHY; NICHOLAS COCCHI, Sheriff; NATALIE CRUZ; MICHAEL VANCINI,

*Defendants-Appellees*,

JOHN DOE 1; JOHN DOE 2,

*Defendants.*

On Appeal from the United States District Court for the District of Massachusetts, No. 3:17-cv-30024-KAR (Robertson, M.J.)

## OPENING BRIEF FOR PLAINTIFF-APPELLANT LIDIA LECH

JOHN R. GODLESKI
277 Main Street, Suite 300
Greenfield, MA 01301
(413) 695-8790

DANIEL S. VOLCHOK
ALLISON M. SCHULTZ
JOSEPH M. MEYER
MICHAEL MOORIN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

June 16, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................ viii

INTRODUCTION ................................................................................... 1

JURISDICTION ..................................................................................... 3

ISSUES PRESENTED ............................................................................ 3

STATEMENT ........................................................................................ 4

    A.    The Death Of Lech's Unborn Baby And The Filing Of This Lawsuit ...................................................................... 4

    B.    Lech's Trial Testimony ...................................................... 5

    C.    Defendants Pervasively Rely At Trial On Extrinsic Evidence (Recorded Phone Calls) To Discredit Lech ............ 9

        1.    *Defendants' opening* ............................................... 9

        2.    *Lech's cross-examination* ..................................... 10

        3.    *Defendants' closing* ............................................. 11

    D.    Lech Is Blocked From Adducing Evidence Corroborating Her Testimony That She Repeatedly Complained To WCC Staff About Symptoms And Repeatedly Asked To Go To The Hospital .............................................................. 12

    E.    The Magistrate Judge Grants Summary Judgment For Cruz ............................................................................... 13

STANDARD OF REVIEW ..................................................................... 15

SUMMARY OF ARGUMENT ................................................................. 15

ARGUMENT ........................................................................................ 19

I.  ZYGMONT'S CORROBORATING TESTIMONY THAT THE
    MAGISTRATE JUDGE EXCLUDED WAS DOUBLY ADMISSIBLE .........................19

    A.  Non-Hearsay Evidence Of Lech's Prior Consistent
        Statements ................................................................19

    B.  Statements Of Then-Existing Condition ............................................26

II. THE MAGISTRATE JUDGE IMPROPERLY ADMITTED RECORDED
    PHONE CALLS AS SUPPOSED EVIDENCE OF LECH'S PURPORTED
    UNTRUTHFULNESS ....................................................................30

III. THE MAGISTRATE JUDGE ERRED IN GRANTING SUMMARY
     JUDGMENT TO CRUZ ....................................................................33

    A.  Reasonable Jurors Could Find That Cruz Acted With
        Deliberate Indifference In Delaying Lech's Access To
        Medical Care ....................................................................34

        1.  *A reasonable jury could find that Lech had a
            serious medical need* ................................................35

        2.  *A reasonable jury could find that Cruz knew of and
            disregarded Lech's serious medical need* ................................37

            a.  A reasonable jury could find that Cruz
                subjectively knew of Lech's serious medical
                need ....................................................................37

            b.  A reasonable jury could decide that Cruz's
                unjustified delay in allowing Lech access to
                medical care constituted deliberate
                indifference ................................................41

    B.  Reasonable Jurors Could Conclude That Cruz's Conduct
        Was Sufficiently Extreme To Constitute IIED ................................45

IV. NONE OF THE JUDGE'S ERRORS WAS HARMLESS .........................................48

    A.  Exclusion Of Zygmont's Testimony................................................48

B.     Admission Of The Recorded Calls As Character
Evidence ............................................................... 52

C.     Summary Judgment .............................................. 55

CONCLUSION ........................................................................ 57

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abernathy v. Anderson*, 984 F.3d 1 (1st Cir. 2020) .................................................43

*Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415
    (5th Cir. 2017) ...............................................42

*Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011) .................................................45

*Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004) ...........................42

*Boswell v. Sherburne County*, 849 F.2d 1117 (8th Cir. 1988) ...............................36

*Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005) .................................................44

*Bradich ex rel. Estate of Bradich v. City of Chicago*, 413 F.3d 688
    (7th Cir. 2005) ...............................................44

*Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44 (1st Cir. 2021) .............................28

*Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997) ......................................36, 42, 45

*Davignon v. Clemmey*, 322 F.3d 1 (1st Cir. 2003) .................................................27

*Dixon v. County of Cook*, 819 F.3d 343 (7th Cir. 2016).........................................47

*Estate of Beauford v. Mesa County*, 35 F.4th 1248 (10th Cir. 2022).....................44

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................52

*Farmer v. Brennan*, 511 U.S. 825 (1994).................................................37

*Fincher v. Town of Brookline*, 26 F.4th 479 (1st Cir. 2022) .................................15

*Fleet National Bank v. Anchor Media Television, Inc.*, 45 F.3d 546
    (1st Cir. 1995).................................................54

*Giroux v. Somerset County*, 178 F.3d 28 (1st Cir. 1999) ...........................39, 40, 41

*Goebert v. Lee County*, 510 F.3d 1312 (11th Cir. 2007).......................36, 40, 41, 43

*Griffin v. Mortier*, 837 F.App'x 166 (4th Cir. 2020).................................................47

*Harris v. Coweta County*, 21 F.3d 388 (11th Cir. 1994) .......................................41

*In re Nexium (Esomeprazole) Antitrust Litigation*, 842 F.3d 34
    (1st Cir. 2016) ...................................................................................................55

*Janney Montgomery Scott LLC v. Tobin*, 571 F.3d 162 (1st Cir. 2009).................27

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ......................................................44

*Koon v. United States*, 518 U.S. 81 (1996)..............................................................15

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) .....................................................34

*Leavitt v. Correctional Medical Services, Inc.*, 645 F.3d 484 (1st Cir.
    2011) ...................................................................................................................35

*Limone v. United States*, 579 F.3d 79 (1st Cir. 2009) .............................................48

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) ..........................................................44

*McInnis v. A.M.F., Inc.*, 765 F.2d 240 (1st Cir. 1985) ...........................................53

*Perry v. Roy*, 782 F.3d 73 (1st Cir. 2015)....................................................36, 37, 42

*Polay v. McMahon*, 10 N.E.3d 1122 (Mass. 2014) .................................................46

*Tlamka v. Serrell*, 244 F.3d 628 (8th Cir. 2001).....................................................44

*Torraco v. Maloney*, 923 F.2d 231 (1st Cir. 1991)..................................................37

*United States v. Abel*, 469 U.S. 45 (1984) ...................................................31, 32, 33

*United States v. Brissette*, 2020 WL 718294 (D. Mass. Feb. 12, 2020).................54

*United States v. Burgos-Montes*, 786 F.3d 92 (1st Cir. 2015).....................15, 48, 56

*United States v. Chiu*, 36 F.4th 294 (1st Cir. 2022).........................19, 20, 22, 23, 26

*United States v. Ford*, 821 F.3d 63 (1st Cir. 2016) .................................................55

*United States v. Frazier*, 469 F.3d 85 (3d Cir. 2006) .............................................22

*United States v. Fulmer*, 108 F.3d 1486 (1st Cir. 1997).........................................15

*United States v. Kilmartin*, 944 F.3d 315 (1st Cir. 2019)......................15, 48, 52, 54

*United States v. Lozada-Rivera*, 177 F.3d 98 (1st Cir. 1999).....................22, 25, 26

*United States v. Padilla-Galarza*, 990 F.3d 60 (1st Cir. 2021) ...............................54

*United States v. Sabean*, 885 F.3d 27 (1st Cir. 2018)..............................32

*United States v. Simonelli*, 237 F.3d 19 (1st Cir. 2001) ..........................33

*United States v. Soler-Montalvo*, 44 F.4th 1 (1st Cir. 2022) ...................51

*United States v. Thomas*, 467 F.3d 49 (1st Cir. 2006)..............................33

*United States v. Wilkerson*, 411 F.3d 1 (1st Cir. 2005) ...............................23, 25, 26

*Vincent v. Louis Marx & Company*, 874 F.2d 36 (1st Cir. 1989)...........................53

*Vittands v. Sudduth*, 730 N.E.2d 325 (Mass. App. Ct. 2000)..................................46

## STATUTES

28 U.S.C.
    §636 ............................................................................................3
    §1291 ..........................................................................................3
    §1331 ..........................................................................................3
    §1367 ..........................................................................................3

42 U.S.C. §1983 .................................................................................4

## RULES

Federal Rule of Appellate Procedure 4....................................................3

Federal Rule of Evidence
    608 ......................................................................2, 10, 16, 30, 31, 32
    608 advisory committee note to 2003 amendments ....................................31
    801 ........................................................................2, 12, 16, 19, 26, 27
    803 ........................................................... 2, 12, 16, 19, 26, 27, 28, 30
    806 ................................................................................30, 33

First Circuit Rule 11.0.........................................................................4

## OTHER AUTHORITIES

1 *McCormick On Evidence* (8th ed.)........................................................32

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Oral argument is warranted in light of the interlocking issues on appeal and the substantiality of plaintiff's claims. The Court's consideration is likely to be aided by the presence of counsel to comment on the issues and respond to questions.

**INTRODUCTION**

While incarcerated and approximately 33 weeks pregnant, plaintiff-appellant Lidia Lech suffered the loss of her unborn baby after jail nurses and other staff rebuffed repeated requests she made—over the course of a week—to be taken to the hospital because something was going seriously wrong with her pregnancy. Lech could not obtain medical care for herself; she could receive care, no matter how urgently needed, only if personnel at the Western Massachusetts Regional Women's Correctional Center (WCC) saw fit to allow it. But during the critical period, they instead disregarded her multiple detailed complaints about unusual discharge, pain, cramping, and decreased or non-existent fetal movement.

Lech brought this action against nurses and other WCC staff seeking to recover for the conduct that led to her unborn baby's death. Faced with Lech's testimony depicting a pattern of indifference to her symptoms and pleas for help, defendants' strategy at trial was to portray her as simply lying. They argued to the jury that she never asked to go to the hospital, nor complained repeatedly about her symptoms, and that she was falsely claiming otherwise in hopes of getting paid.

Defendants' strategy succeeded; the jury found defendants not liable for negligence, deliberate indifference to Lech's medical needs, and intentional infliction of emotional distress (IIED). But it succeeded only because the magistrate judge who presided committed two critical evidentiary errors.

*First*, after defendants cross-examined Lech at length in an effort to portray her as lying—and argued to jurors again and again that they should disbelieve Lech because there was no contemporaneous corroboration of her claims about repeated complaints to jail staff—the judge invoked the hearsay rule to bar Lech from introducing precisely such corroborating evidence: testimony from a person who visited her during the relevant time that she had in fact made such repeated complaints to defendants.  That evidence was admissible on two independent grounds: as (non-hearsay) prior consistent statements, under Federal Rule of Evidence ("FRE") 801(d)(1)(B)(i), and as (admissible hearsay) statements of then-existing condition, under FRE 803(3).

*Second*, the judge improperly allowed defendants to introduce similar hearsay—phone-call recordings of Lech talking with (and sometimes lying to) her family and boyfriend about matters unrelated to her medical care—to show Lech's purported untruthful character.  The admission of this evidence for that purpose was a crystal-clear violation of FRE 608(b).

Because this case turned largely if not entirely on Lech's credibility, these errors likely affected the verdict—although the relevant harmlessness standard is far lower, requiring reversal unless it is highly probable that the errors did *not* affect the verdict.

Finally, before trial the magistrate judge improperly granted summary judgment to defendant Natalie Cruz, a correctional officer who disregarded Lech's pleas for help on the night that Lech's baby was stillborn, on Lech's deliberate-indifference and IIED claims.  Although the judge scarcely explained her ruling—giving it just two short sentences—the summary-judgment record, viewed in the light most favorable to Lech, would have easily allowed a reasonable jury to find for Lech on both claims.

Each of these three errors alone, and certainly all of them (or even any two) in combination, requires reversal.

## JURISDICTION

The district court had subject-matter jurisdiction over Lech's federal and state claims under 28 U.S.C. §§1331 and 1367, respectively.  Pursuant to 28 U.S.C. §636(c), the magistrate judge entered final judgment on June 8, 2022, and Lech timely appealed on June 27, *see* Fed. R. App. P. 4(a)(1).  This Court thus has jurisdiction under 28 U.S.C. §§636(c)(3) and 1291.

## ISSUES PRESENTED

Whether the magistrate judge committed reversible error by:

1.    Excluding testimony from a man who visited Lech at the WCC during the relevant period about statements she made to him during those visits that corroborated her trial testimony,

2.     Admitting recorded phone calls Lech made while at the WCC as character evidence of her supposed untruthfulness, and/or

3.     Granting summary judgment to Cruz on Lech's deliberate-indifference and IIED claims.

## STATEMENT[1]

### A.     The Death Of Lech's Unborn Baby And The Filing Of This Lawsuit

Lech lost her unborn baby when she was approximately 33 weeks pregnant and incarcerated at the WCC.  JA49.  She brought this action alleging that WCC medical staff and corrections officers disregarded her repeated complaints to them about the serious medical problems she was having with her pregnancy and refused her multiple requests to go to the hospital.  JA41-49.  Lech brought claims under 42 U.S.C. §1983 for deliberate indifference to her medical needs in violation of the Eighth Amendment, JA50-57, and state-law claims for IIED, negligence, and medical malpractice, JA57-61.  The parties agreed to have a magistrate conduct all the proceedings.  JA2.

---

[1] Pursuant to Circuit Rule 11.0(d), the parties are filing a supplemental appendix volume containing sealed record material.

## B. Lech's Trial Testimony[2]

At trial, Lech provided the following version of the relevant events:

After being locked in her cell the night of December 22, 2023, Lech felt a sudden "dropping feeling" and "bulging sensation" in her abdomen, started to experience a "greenish" vaginal discharge, and "couldn't feel [the baby] moving." JA428-429. This scared her and she was unable to sleep. JA429. Lech was then about two weeks away from her release and three weeks from her scheduled cesarean-section delivery. JA463. A C-section was scheduled because a prior uterine rupture increased her risk of rupture during labor. JA312, 323-324.

The next morning, Lech reported her symptoms to a nurse distributing medications in her cellblock. JA430. The nurse told Lech to talk to another nurse when Lech went to the medical department (known as "Medical") later that day for methadone treatment (which she received for pre-incarceration heroin dependence). JA430-431. Lech did so, telling defendant Maria Diaz about the dropping sensation, about the discharge, and that she could no longer feel her baby moving. JA431. Lech asked Diaz "if [she] could go to the hospital," and if Diaz "could check the … heartbeat of the baby." JA432. Diaz ignored these requests,

---

[2] As mentioned, the magistrate judge granted summary judgment to Cruz before trial on two of Lech's claims. The substance of Lech's trial testimony is part of the summary-judgment record, so that testimony (and other trial-related matters) are discussed before the summary-judgment ruling.

instead telling Lech to cut her fingernails because they were too long and that Lech was "going to be an overbearing mother and have overbearing kids," JA433—but that Lech should feel free to come back if her problems continued. JA433-435. Lech returned to her cell, where she cried and tried to feel her baby kicking. JA434.

Lech returned to Medical later that day and spoke with defendants (and nurses) Nicole Skorupski and Lynn Chase. JA435. Lech recounted her continuing symptoms and again asked to go to the hospital. JA436. Skorupski and Chase refused. *Id.* They instead checked for a fetal heartbeat, which existed but was weak, and told Lech her stress was causing stress for the baby and that her symptoms were probably due to her being almost full-term. JA437-438, 442.

Lech's symptoms persisted, but she was "prevented from going" to Medical to discuss them. JA447-448. Lech next saw a nurse (defendant Shantelle Rosado) on December 27; Rosado refused to check for a fetal heartbeat and ignored Lech's pleas to get to a hospital. JA453-456. Lech asked Rosado to allow her to "see a doctor at a hospital," JA456, because her discharge had "turned bloody," her abdominal bulging was recurring, and the baby was not moving much, JA454-455. Instead of addressing any of that, Nurse Rosado focused on Lech's leg itching and numbness. *Id.*

On December 29, Lech again sought treatment, meeting with another nurse, defendant Julie Belle-Isle, to whom Lech complained about the discharge, bulging, cramping, and headaches. JA460. Belle-Isle denied Lech's request to go to the hospital, telling her to lie down with a cold compress on her head. JA462.

On December 30, Lech was called from her cell to meet with defendant Dorothea Von Goeler, a doctor treating patients at the WCC that day. JA462-464. Lech reported to Von Goeler all the symptoms she had been experiencing since December 23, adding her discharge was now brownish. JA464. She said she "wanted to go to the hospital" and asked Von Goeler to "check the heart rate for the baby." *Id.* Von Goeler refused to check for a heartbeat, feel Lech's abdomen, or allow her to go to the hospital. JA464-465. She instead told Lech that she would make an appointment for Lech with a nurse midwife for the following day (December 31). JA465. That was not "what [Lech] thought" she needed. *Id*. Lech was "scared that something bad [wa]s happening" and "wanted it checked" immediately. *Id*. She felt she "wasn't being heard" and that "[n]othing was being addressed." JA466.

The midwife appointment never happened; Lech was not even taken to Medical on December 31. JA467. Nor did she see the midwife on January 1. JA468. Her symptoms persisted, however: "[T]here was no movement" from the

baby, "[i]t was just bulging, crampy, and discharge." JA467. At this point, Lech had about a week left before her release. JA463.

Around 10 pm on January 1, when Lech stood up to have her ID scanned by Cruz during an inmate count, she suddenly felt "gushing fluid" start to come out. JA469. Lech went to the toilet and saw she was bleeding "a lot worse" than "having [her] period." JA470. She immediately "hit the buzzer to" speak to Cruz. *Id.* Cruz did not answer for minutes. *Id.* When Cruz finally answered, Lech said she needed medical attention immediately because she thought her water had broken. JA471. Cruz said she would contact Medical. *Id.* When Cruz returned to the intercom, she said the staff wanted to know if Lech could wait until morning. *Id.* Lech said no, the baby was coming. *Id.* After what "[f]elt like forever," Cruz eventually unlocked her door, and Lech was escorted to Medical. JA483.

By the time Lech arrived at Medical, she had the feeling her baby was dead. JA485. Yet her situation was still not "treated like an emergency." *Id.* She met with defendant Elizabeth Meaux, another nurse, telling her the baby was not moving and that she was in labor. JA485-486. Meaux saw blood on Lech's clothes. *Id.* She checked for a fetal heartbeat and said she heard one, but Lech said that was her heartbeat, not the baby's. JA487-488. Lech again begged to go to the hospital immediately. *Id.* Medical staff finally agreed that Lech should go

to the hospital, but nevertheless delayed her transport for hours while they completed a shift change and strip-searched Lech. JA488-494.

When Lech arrived at the hospital on the morning of January 2, she was quickly told by doctors that her baby, whom she had named Kaiden, was dead. JA495-496.

### C. Defendants Pervasively Rely At Trial On Extrinsic Evidence (Recorded Phone Calls) To Discredit Lech

At trial, the magistrate judge permitted defendants to use recorded calls that Lech had with her family and boyfriend while at the WCC to support their central strategy of portraying Lech as lying. Defendants referred to these recordings throughout trial, both in arguing that the recordings provided no corroboration of what Lech testified she had told defendants during the relevant period and in separately arguing that the recordings showed Lech's general character for untruthfulness.

#### 1. *Defendants' opening*

Defense counsel began her opening statement by telling jurors that they would:

> hear two stories. The first … is the story … that was just told to you by [Lech's counsel]. The other … is told by the seven medical professionals[.] It's the same story that is also told by the medical records[.] *It is also the same story that is told by Lidia Lech's … phone calls*."

JA293 (emphasis added).  Counsel referred to the calls again soon thereafter, arguing that defendants' version of events was confirmed "by Lidia Lech … in the 26 recorded phone conversations that she had with family and her boyfriend during this ten day period."  JA298.  "What you won't hear Lidia and her mother discussing" in those recordings, counsel told the jury, "is that Lidia thinks she needs to go to the hospital, that Lidia has asked the medical providers to send her to the hospital and they have refused."  JA299; *see also* JA300.

### 2.    *Lech's cross-examination*

Defendants likewise repeatedly relied on Lech's recorded phone calls to attack her credibility through five days of cross-examination, including again flagging that the recordings did not corroborate Lech's testimony about having complained to defendants.  *See* JA632-634, 643-646, 652-654, 686-687, 770-772, 804-805.

The magistrate judge also admitted portions of eight calls that had nothing to do with Lech's medical care or condition, supposedly to show her purported general character for untruthfulness.  *See* JA714-724.  The judge initially excluded evidence for that purpose as barred by FRE 608.  *See* JA662-665, 680-681.  But the judge later reversed course, stating that "to the extent I have discretion on that issue, I will permit that evidence."  JA711-712.

### 3. Defendants' closing

In closing arguments, defendants told jurors yet again that this case was about credibility, urging them to listen to the recorded phone calls in evaluating truthfulness—and stressing anew that those recordings did not corroborate Lech's testimony:

> At the beginning …, I told you that you were going to hear two stories.… Her story is that she repeatedly reported profound problems with her pregnancy to her medical providers … and repeatedly asked to be sent to the hospital, but the medical providers refused to send her.… [T]h[e] second story … is told through Lidia Lech's recorded phone conversations. That story is told not by what she does say, but … *by what she does not say.… If you are having any doubt as to the veracity of our story, please listen to those phone calls.*

JA920-921 (emphasis added). Defendants' counsel then ticked through each nurse encounter, contending that Lech's failure to discuss those encounters on the phone with her family or boyfriend showed that Lech's testimony was fabricated. *See* JA930-935, 941-942.

Defendants' counsel also argued at length that the recorded phone calls showed that Lech was generally not a truthful person and hence that her testimony should be rejected. "[I]f she'll lie to her mother and brother," counsel argued, pointing to a call Lech had with them, "wouldn't she also lie here where the stakes are a heck of a lot higher for her?" JA939-940.

### D. Lech Is Blocked From Adducing Evidence Corroborating Her Testimony That She Repeatedly Complained To WCC Staff About Symptoms And Repeatedly Asked To Go To The Hospital

Seeking to answer defendants' pervasive attacks on her truthfulness—attacks bolstered, as discussed, by the admission of her recorded calls that defense counsel said over and over did not corroborate her testimony—Lech sought to present live testimony from a close friend, Alfred Zygmont, about corroborating statements she made to him during his visits at the WCC on December 26 and 28. JA146-148. Zygmont would have testified that during their visits, Lech "complained WCC medical staff were not paying attention to her, she was experiencing decreased fetal movement, felt that something was wrong, and that she thought she needed to go to the hospital." JA147. This testimony would have matched Zygmont's deposition testimony that, during one visit, Lech told him that she had alerted WCC medical staff that "she could no longer feel the baby," and that in response the WCC staff just gave her "two aspirins and told [her they'll] see [her] in the morning," despite her having "mentioned several times that she felt there was definitely something wrong." JA781. Lech argued that Zygmont's testimony was admissible both as (non-hearsay) prior consistent statements, under FRE 801(d)(1)(B)(i), and as (admissible hearsay) statements of then-existing condition, under FRE 803(3). JA147. Defendants responded that Rule 801 was inapplicable because Lech's cross-examination had not included "a charge of

recent fabrication," JA150, and that Rule 803 was inapplicable because Lech's statements to Zygmont "were not contemporaneous with [her] actual sensations," JA151.

The magistrate judge excluded Zygmont's testimony, ruling that Lech could not offer it "to bolster her testimony that she told the[] nurses that she wanted to go to the hospital and that they ignored her," because "[t]here's not cross-examination on that point" by defense counsel. JA782-783. The judge did not address Lech's argument that the statements were admissible under Rule 803(3).

When Zygmont testified, therefore, he was barred from corroborating Lech's version of events—specifically, that by December 26 and 28, she had sought to go to the hospital and was not receiving adequate medical care. Zygmont was allowed to say only, based on his "impression" but not "anything … that was said" during his visits, whether *he* "th[ought] she needed to go to the hospital." JA854.

The jury rendered a verdict for defendants on all claims. JA158-170.

### E.     The Magistrate Judge Grants Summary Judgment For Cruz

Some of Lech's claims were resolved for defendants at summary judgment, including—as relevant here—her deliberate-indifference and IIED claims against Cruz. JA18-19.

The summary-judgment record on those claims included Lech's pretrial deposition testimony (which mirrored her trial testimony recounted above, *see*

pp.5-9) as well as a sworn affidavit Lech provided. The affidavit explained that when Lech contacted Cruz from her cell the night of January 1, 2014—having just started gushing blood, the culmination of a week of worsening symptoms—and told Cruz that she "was in labor and needed to go to the hospital right now," "Cruz did not come to check on" her but instead "told [her] everything was fine." JA143-144. Lech's affidavit also stated that when Lech renewed her plea for help, Cruz told her to wait, saying she would contact medical staff after the inmate count. JA144. Cruz did not go to Lech's cell, Lech further stated, or otherwise check on her at that point. *Id*. And although Cruz testified in deposition that the count process takes only two or three minutes, JA69, Lech's affidavit stated that Lech "waited for about twenty minutes before anything happened," JA144. After twenty minutes, Cruz called back and asked if Lech could "wait until morning." *Id*. Lech then "begged for help" again, and her cellmate "jumped off her bunk and started screaming that someone needed to help." *Id*. "Eventually," Lech "heard Natalie Cruz say 'Lech, medical' and the door opened," at which point Lech was escorted to Medical. *Id*. As discussed, Lech was transported to the hospital hours later, where she learned that her baby was dead. JA495-496.

The magistrate judge ruled that Cruz's alleged "twenty-minute delay in transferring Plaintiff from her cell to the medical unit while she was bleeding may have been negligence on Cruz's part, but it was not deliberate indifference." JA18.

And "[b]ecause the bar for IIED liability may be as high as the standard for …

deliberate indifference, … Plaintiff has [also] not shown … IIED."  JA19.

## STANDARD OF REVIEW

This Court "review[s] a … grant of summary judgment de novo, drawing all

reasonable inferences in favor of the nonmoving party."  *Fincher v. Town of*

*Brookline*, 26 F.4th 479, 485 (1st Cir. 2022) (quotation marks omitted).  It

"reviews evidentiary rulings for abuse of discretion."  *United States v. Burgos-*

*Montes*, 786 F.3d 92, 114 (1st Cir. 2015).  "A district court … abuses its discretion

when it makes an error of law."  *Koon v. United States*, 518 U.S. 81, 100 (1996).

Moreover, "abuse of discretion sounds worse than it really is. …  It simply means

… [the] reviewing court … has a definite and firm conviction that the" challenged

ruling was erroneous.  *United States v. Kilmartin*, 944 F.3d 315, 335 (1st Cir.

2019) (quotation marks omitted).

If an evidentiary ruling is erroneous, a new trial is required unless "it is

'highly probable' that the error did not contribute to the verdict."  *Kilmartin*, 944

F.3d at 338 (quoting *United States v. Fulmer*, 108 F.3d 1486, 1498 (1st Cir. 1997)).

## SUMMARY OF ARGUMENT

I.     The magistrate judge erroneously excluded Zygmont's testimony that

Lech told him, when he visited her on December 26 and 28, that WCC staff were

ignoring her serious medical needs and requests to go to the hospital.  Those

statements, which corroborated Lech's testimony, were admissible under both FRE

801(d)(1)(B)(i), as non-hearsay prior consistent statements, and FRE 803(3), as

admissible hearsay of then-existing condition. They were admissible as prior

consistent statements because, contrary to the judge's recollection, Lech's cross-

examination was replete with questions and materials (medical notes and recorded

calls) aimed at showing that Lech fabricated her testimony about her complaints

and requests to go to the hospital. The judge also failed entirely to address Lech's

argument that her statements to Zygmont were admissible statements of her

condition and state of mind on December 26 and 28, including her motive and

intent to go to the hospital, her concerns about the care she had received and about

the baby's health, and her own physical condition. At trial, moreover, defendants'

only argument against admission on this ground was that Lech's statements to

Zygmont were not contemporaneous with her physical symptoms. That is both

incorrect and ignores that the statements were relevant to other conditions (mental,

emotional, and sensory) that Rule 803(3) encompasses. The new arguments

against admission that defendants raised in this Court in opposing Lech's motion

for transcript fees are equally infirm.

II.     The magistrate judge erred again by admitting, for the sole purpose of

attacking Lech's truthfulness, telephone recordings in which Lech lied to others

about matters unrelated to her medical care. The admission violated FRE 608(b),

which prohibits the use of extrinsic evidence to show untruthfulness. Indeed, the judge correctly excluded the evidence on that ground the first two times it was offered, but then admitted it with virtually no explanation. Perhaps she agreed with defendants' claim that the recordings were not "extrinsic" evidence because they were previously admitted for another purpose. But that claim is wrong; extrinsic evidence is anything other than testimony elicited during cross-examination. Defendants were likewise wrong to argue that Rule 608(b) permitted the evidence because the rule allows conduct "to be inquired into" on cross-examination. That provision allowed the defense to *ask* Lech about the calls—not to play recordings of them as supposed evidence of general untruthfulness.

III.    The magistrate judge erred in granting summary judgment to Cruz on Lech's deliberate-indifference and IIED claims. The judge correctly concluded that Lech had a serious medical need on the night of January 1, but failed to credit evidence (as required) from which reasonable jurors could find that Cruz knew Lech both faced a substantial risk of serious harm and needed immediate medical care, yet failed—for no reason—to allow access to such care. When Lech was in labor, bleeding, and experiencing severe pain, a reasonable factfinder could decide that a 20-minute delay in access to medical care constitutes deliberate indifference.

Similarly, in granting summary judgment on Lech's IIED claim, the judge failed to credit evidence from which reasonable jurors could find that Cruz's

conduct was extreme and outrageous. Again, the summary-judgement record contained evidence that Cruz knew Lech was in labor, bleeding, and in pain, yet ignored Lech's cries for help for twenty minutes, leaving Lech terrified for the fate of her baby. A reasonable jury could find that conduct outrageous and intolerable in a civilized society.

IV.    None of the magistrate judge's errors was harmless. Because defense counsel made this case turn largely if not entirely on Lech's credibility, it is not highly probable that the jury's evident rejection of Lech's testimony would have been the same had the judge not (1) admitted recordings that defendants repeatedly flagged as supposedly establishing Lech's untruthfulness and (2) prevented Lech from eliciting testimony from Zygmont that would have provided *precisely* the corroboration of Lech's own testimony that defense counsel repeatedly faulted her for supposedly not having. Considered separately or together, those two errors were critical. And as to summary judgment, although the jury ultimately found Cruz not negligent, that finding (like the rest of the trial) was likely influenced by the harmful evidentiary errors, given that that claim also came down to Lech's credibility. The negligence verdict thus does not render harmless the error at summary judgment.

# ARGUMENT

## I.     ZYGMONT'S CORROBORATING TESTIMONY THAT THE MAGISTRATE JUDGE EXCLUDED WAS DOUBLY ADMISSIBLE

The magistrate judge ruled on hearsay grounds that Al Zygmont could not testify that Lech told him during his December 26 and 28 visits with her that WCC medical staff were ignoring her serious medical needs and requests to go to the hospital.  That was error.  Indeed, Zygmont's testimony was admissible on two grounds:  It was (non-hearsay) prior consistent statements admissible under FRE 801(d)(1)(B)(i), and it was (hearsay) statements of then-existing condition, admissible under FRE 803(3).  The counterarguments defendants have offered lack merit.

### A.     Non-Hearsay Evidence Of Lech's Prior Consistent Statements

Under Rule 801(d)(1)(B)(i), a declarant-witness's prior statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement" that "is consistent with the declarant's testimony and is offered … to rebut an express or implied charge that the declarant recently fabricated it."  In other words, "a witness's prior statement is" not excludable as hearsay "when (1) the declarant testifies at trial and is subject to cross-examination; (2) the prior statement is consistent with the declarant's trial testimony; and (3) the prior statement is offered to rebut a[] … charge against the declarant of recent fabrication."  *United States v. Chiu*, 36 F.4th 294, 300 (1st Cir. 2022) (quotation

marks omitted), *cert. denied*, 143 S.Ct. 336 (2022).  All three elements are satisfied here.

1.     The first element is indisputably met:  Lech "testifie[d] at trial and [wa]s subject to cross-examination."  *Chiu*, 36 F.4th at 300.

2.     The second element—that "the prior statement is consistent with the declarant's trial testimony," *Chiu*, 36 F.4th at 300—is likewise satisfied.  The pertinent prior statements are Lech's statements to Zygmont on December 26 and 28 that WCC staff were ignoring her serious medical needs and refusing her pleas to go to the hospital.  As Lech's motion to admit Zygmont's testimony explained, that testimony "would include that during [his December 26 and 28] visits, Lech complained WCC medical staff were not paying attention to her, she was experiencing decreased fetal movement, felt that something was wrong, and that she thought she needed to go to the hospital."  JA147.  These prior statements by Lech are "consistent with [her] trial testimony," *Chiu*, 36 F.4th at 300, about episodes throughout the ten days leading up to January 2, 2014 (when she was finally sent to the hospital), in which WCC staff were dismissive of her serious medical needs and ignored her requests to go to the hospital.

For example, Lech testified at trial that on December 23, she told Diaz that she "felt the baby drop," JA431, and asked if she "could go to the hospital to get checked out," JA432, to which Diaz responded that Lech should "cut [her] nails"

because "[t]hey were too long" and that Lech was "going to be an overbearing mother and have overbearing kids," JA433. Likewise, Lech testified that Diaz "wasn't listening to [her] needs," *id.*, consistent with Zygmont's proffered testimony that "Lech complained WCC medical staff were not paying attention to her," JA147.

In fact, Lech's trial testimony was filled with examples of similar episodes that Zygmont's proffered testimony would have corroborated. For instance, Lech testified that:

- on December 23, she asked two nurses if she could "see a doctor … [a]t the hospital," to no avail, JA436;

- "[o]n Christmas day," she "ask[ed] to go to Medical in the evening" but was denied permission, JA448;

- on December 27, she "report[ed] cramping and pain" and "asked [Rosado] if [she] could go see a doctor at a hospital" but was refused, JA456;

- on December 29, she "asked [Belle-Isle] if [she] could go to the hospital because [her] symptoms [had] not change[d]," to which Belle-Isle responded that Lech should "[l]ay down on [her] side and put a cold compress on [her] head," JA462; and

- during a December 30 visit with Von Goeler, she felt "[l]ike [she] wasn't being heard" and that "[n]othing was being addressed," JA466.

What "wasn't being heard" or "addressed," JA466, were Lech's repeated complaints and requests to WCC staff—complaints and requests that Zygmont would have told jurors he heard about contemporaneously from Lech. Lech even

confirmed at trial that "during [Zygmont's] visits" she had "conversations with [him] about everything going on with" her. JA453. This too would have been confirmed by Zygmont's testimony.

In short, the second element is satisfied because Zygmont's testimony would have been entirely consistent with Lech's.

3.    The magistrate judge focused on the third requirement: that "the prior statement [be] offered to rebut a[] … charge against the declarant of recent fabrication," *Chiu*, 36 F.4th at 300. "[T]he bar is not high" to satisfy this requirement, in part because the suggestion of recent fabrication "need not be expressly made." *United States v. Lozada-Rivera*, 177 F.3d 98, 104 (1st Cir. 1999). Rather, a proponent of prior consistent statements need only "point to specific questions during [her] adversary's examination that *suggest* recent fabrication." *Id*. (emphasis added). Or as the Third Circuit paraphrased this Court's precedent, it suffices that "the cross-examiner's questions reasonably imply intent on the part of the witness to fabricate." *United States v. Frazier*, 469 F.3d 85, 89 (3d Cir. 2006) (citing *Lozada-Rivera*, 177 F.3d at 103-104). And when fabrication is reasonably implied, evidence of prior statements is admissible if there is "some degree of fit between the alleged fabrication and the prior statement[s]," *Chiu*, 36 F.4th at 301, such that the "prior consistent statements … have some rebutting force beyond the mere fact that the witness has repeated on a

prior occasion a statement consistent with [her] trial testimony," *United States v. Wilkerson*, 411 F.3d 1, 5 (1st Cir. 2005) (quotation marks omitted).

The magistrate judge abused her discretion by failing to recognize the "implied charge" of fabrication, *Chiu*, 36 F.4th at 300, that Zygmont's proffered testimony would have rebutted. The judge recognized that one "purpose for which [Lech was] proposing to offer [Zygmont's] testimony" was "to bolster her testimony that she told these nurses that she wanted to go to the hospital and that they ignored her." JA782-783. But she excluded Zygmont's testimony on the ground that "[t]here's not cross-examination on that point by" defense counsel. JA783.

That is incorrect; there *was* cross-examination on that point. For instance, in explaining her exclusion ruling, the judge stated, "I don't recall [defense counsel] putting the notes up of Ms. Rosado and saying, isn't it true that the notes here don't show any statement … about bulging …, cramping, pain, vaginal discharge or a plea to go to the hospital." JA774. In reality, counsel did exactly that, showing Rosado's notes to Lech and getting her to concede that they show Lech complaining only about other issues:

> [Y]ou testified that on December 27 you told Nurse Rosado about mucousy stuff, … blood discharge … [and] to send you to the hospital, right? … [D]oes this appear to be a note written by Shantelle Rosado on December 27, 2013? … And the note says "patient presents with complaints of BLE. I feel warm going down my leg and it's numb". Denies pain, states "it's

itchy[.]" [T]his note … contains a report of you complaining about your leg and sciatica, correct?

JA642-643, 645. Counsel also used Lech's recorded calls to imply during cross-examination that she fabricated her testimony. For example, after Lech agreed that she "testified that [on December 27 she] asked Nurse Rosado to send [her] to the hospital," JA642, counsel confronted her with a recorded call from that day in which Lech did not tell her boyfriend that WCC medical staff were ignoring her medical needs, *see* JA643. Counsel stated in her questioning that Lech "didn't even mention the baby or the pregnancy in [that] call." *Id.*

Indeed, defense counsel incessantly used recorded calls between Lech and her boyfriend (Joe Challet) or family to imply that Lech's testimony was fabricated. She asked Lech:

- "[Y]ou didn't mention anything about your pregnancy during that call?" JA626.

- "[D]uring this 30 minute call after your visit with Nurse Practitioner Skorupski and Nurse Chase, you didn't mention anything to do with your medical condition or the health of your baby, correct?" JA627.

- "All these calls that you had with Joe, any call that you had with Joe between December 23 and January 1 you really didn't talk about the baby?" JA644.

- "[T]here's nothing in that call where you discussed the health of your pregnancy? … Read the part of the transcript in that call where you discuss your pregnancy with Joe." JA651.

- "Did you mention anything to Joe about anyone refusing to send you to the hospital in that call? … You didn't tell the father of your baby

that you needed to go to the hospital but people at the WCC refused that request?"  JA652.

- "[I]f the transcript of that phone call indicated that you never reported to Joe that you were frightened for the life of your child, would you have any reason to disagree with that? …  If that transcript also indicated that you didn't mention anything about trying to get to the hospital and being refused, would you have any reason to disagree?"  JA653-654.

- "[T]he transcripts of these 26 calls between December 23rd and December 31st do not contain any report that you've asked to go to the hospital and have been refused.  Do you have any reason to believe that's not true?"  JA687.

In seeking the admission of Zygmont's testimony, Lech's counsel "point[ed] to [these] specific questions," *Lozada-Rivera*, 177 F.3d at 104, explaining how they "suggest[ed] recent fabrication," *id.*, of Lech's testimony that WCC medical staff ignored her serious medical needs and requests.  As counsel told the magistrate judge, defense counsel had "used transcripts, waved them around the courtroom, said there's nothing in these transcripts that say that you wanted to go to the hospital, again and again and again."  JA776.  Lech's counsel also explained how Zygmont's testimony would have had "rebutting force" against the suggestion of fabrication, *Wilkerson*, 411 F.3d at 5, noting that while "[t]here's nothing in the phone calls," Lech reported her experience "to a person who came and sat with her during a visit," JA777.  Counsel further argued that "[w]hen the only single person who visited her in jail, the only one, can come in and … say, I sat with her for hours and talked to her and she was upset and she was worried and she said to me,

I want to go to the hospital, that is probative … that there is not a recent fabrication." JA777-778. As Lech's counsel had put it earlier in the trial, "the phone calls are being used as a tool to discredit her, so that's why we want to put in the consistent statement." JA700-701.

The magistrate judge's rejection of these arguments was an abuse of discretion. Defense counsel's questions easily cleared the "not high" bar of "suggest[ing] recent fabrication," *Lozada-Rivera*, 177 F.3d at 104, and there was a "fit between the alleged fabrication and the prior statement[s]" to which Zygmont would have testified, *Chiu*, 36 F.4th at 301. Those "prior consistent statements" thus would have had "rebutting force" against the charge of fabrication, *Wilkerson*, 411 F.3d at 5, meaning Rule 801(d)(1)(B)(i) was satisfied.

## B.     Statements Of Then-Existing Condition

Zygmont's testimony was independently admissible under Rule 803(3), which provides that a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is "not excluded by the rule against hearsay."

Lech's motion to admit Zygmont's testimony cited Rule 803(3), *see* JA338—as it did Rule 801(d)(1)(B)(i), *see id.*—and her counsel repeatedly raised that rule as another ground for admitting the testimony, *see* JA393-394, 786. Yet

the magistrate judge ignored the rule. *See* JA393-394, 786-787. Indeed, in ruling on Lech's motion to admit Zygmont's testimony, the judge cited two Rules of Evidence—801(d)(1)(B) and 803(4), the latter of which Lech never invoked—but not Rule 803(3), which Lech had invoked (repeatedly). *See* JA783, 786-787.

The judge's failure to address Lech's Rule 803(3) argument was itself error, because "[a]n abuse of discretion occurs if a district court fails to consider a significant factor in its decisional calculus." *Janney Montgomery Scott LLC v. Tobin*, 571 F.3d 162, 166 (1st Cir. 2009) (quotation marks omitted). Likewise, a court abuses its discretion by "failing to address [an] issue squarely raised" by a party. *Davignon v. Clemmey*, 322 F.3d 1, 15 (1st Cir. 2003).

If the judge had considered Rule 803(3), she likely would have (and certainly should have) admitted Zygmont's testimony thereunder. Lech's statements that Zygmont would have recounted pertained to her condition on December 26 and 28. Specifically, he would have corroborated her testimony regarding several aspects of her physical condition and state of mind then, including (1) her motive and intent to go to the hospital, (2) her concerns regarding the adequacy of the medical care she had received and about the health of her baby, and (3) her own physical condition.

Defendants opposed admission under Rule 803(3) on the ground that Lech's statements to Zygmont were inadmissible as evidence of her "physical sensations"

because they "were not contemporaneous with the actual sensations." JA151. That cannot be squared with Zygmont's proffered testimony, which would have addressed Lech's ongoing symptoms: As Lech's counsel explained in urging admission of Zygmont's testimony, Lech "says things [to Zygmont] about what she's feeling *right now*," such as "I can't feel the baby moving, I definitely feel like something's wrong." JA786 (emphasis added). In any event, defendants offered no argument that the statements were inadmissible as evidence of the other conditions (mental, emotional, and sensory) that Rule 803(3) covers.

Defendants took a different tack on this issue in opposing Lech's motion in this Court for the payment of transcript fees, contending (pp.7-8) that the magistrate judge properly excluded Zygmont's testimony under Rule 803(3) because "the issue at trial was not whether Ms. Lech was experiencing medical issues when Zygmont visited her on December 26 or December 28," but rather "whether [Lech] reported undocumented medical issues to the Defendants … on December 27, 29 and 30." That argument is waived because it was not made below. *See, e.g.*, *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021). It is also meritless, as it goes to the *weight* of Zygmont's testimony. It has no bearing on whether the testimony was admissible under Rule 803(3). The argument also ignores that Zygmont's testimony as to statements reflecting Lech's state of mind on December 28 are germane to the concededly relevant dispute

about what occurred on December 27.  As for Zygmont's visit on December 26,

Lech's statements that day—regarding her motive and intent to go to the hospital

as well as her concerns about the adequacy of the medical care she had received

and about the health of her baby—are highly relevant to Lech's claim that

defendants were deliberately indifferent to the symptoms she indisputably reported

on December 23.  Defendants have never argued otherwise.

Instead, defendants have suggested that Lech's counsel failed to indicate to

the magistrate judge that Zygmont would testify about statements Lech made on

December 26 and 28, rather than on other days he visited.  *See* Opp. to Mot. for Tr.

Fees 8.  Again, defendants never explained how that has anything to do with

whether Zygmont's testimony was *admissible* under Rule 803(3).  Regardless, the

argument is wrong:  Lech's motion to admit Zygmont's testimony explained that

"Zygmont's testimony [would] regard visits with the plaintiff *on December 26 and

28*" and "would include that during the above-mentioned visits Ms. Lech

complained WCC medical staff were not paying attention to her, she was

experiencing decreased fetal movement, felt that something was wrong, and that

she … needed to go to the hospital."  JA147 (emphasis added).

In sum, the magistrate judge abused her discretion by failing to accept—or

even address—Lech's argument for allowing Zygmont's proffered testimony under

Rule 803(3).  Again, that provided a second, independent basis for admitting the testimony.

## II.    THE MAGISTRATE JUDGE IMPROPERLY ADMITTED RECORDED PHONE CALLS AS SUPPOSED EVIDENCE OF LECH'S PURPORTED UNTRUTHFULNESS

FRE 608(b) states that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack … the witness's character for truthfulness.  But the court may, on cross-examination, allow them to be inquired into[.]"  The magistrate judge unquestionably violated this rule by permitting defendants to play portions of eight recorded calls to prove Lech's purported character for untruthfulness.  *See* JA711-724.

That ruling was a reversal by the judge; the first two times defendants tried to introduce Lech's calls on cross-examination to show supposed untruthfulness, the judge correctly excluded the evidence under Rule 608(b).  JA662-665, 679-681.  As the judge stated on the second occasion, "[y]ou're attacking her character for truthfulness. … That's exactly what I see as not permitted under Rule [608(b).]"  JA680.  But the judge then invited defendants to file a motion on the issue.  *Id*.  Defendants did so, arguing that the calls (1) were not "extrinsic" evidence because they had already been admitted for another purpose; (2) were admissible because Rule 608(b) allows instances of untruthfulness "to be inquired into" on cross-examination; and (3) were admissible under Rule 806, which says a

hearsay "declarant's credibility may be attacked … by any evidence that would be admissible for those purposes if the declarant had testified as a witness." *See* JA155-156.

The next trial day, the magistrate judge admitted the evidence without any explanation for the about-face. JA712. Defendants then introduced and cross-examined Lech about eight recorded calls in which she lied to her mother and brother about things unrelated to her medical care—all to show her supposed character for untruthfulness, i.e., to show her testimony was fabricated. *See supra* pp.9-11.

The magistrate judge had it right the first two times; the calls were inadmissible as evidence of untruthful character. Indeed, Rule 608(b) provides an "absolute prohibition" on using extrinsic evidence to show untruthful character. Fed. R. Evid. 608, advisory committee note to 2003 amendments. As the Supreme Court has elaborated, the rule "allows a cross-examiner to impeach a witness by asking him about specific instances … probative of his … 'character for … untruthfulness.' The Rule limits the inquiry to cross-examination …, however, and prohibits the cross-examiner from introducing extrinsic evidence of the witness' past conduct." *United States v. Abel*, 469 U.S. 45, 55 (1984). This Court has accordingly held that admitting an "audiotape [that] would have shown—far more powerfully than cross-examination—[the witness's] … 'pattern of lying' … runs

headlong into Federal Rule of Evidence 608(b)." *United States v. Sabean*, 885 F.3d 27, 39 (1st Cir. 2018).

That is just what happened here. The recordings were extrinsic evidence. And they were offered to prove Lech's supposed untruthfulness by pointing to specific things she told her family.

Defendants wrongly claimed below that the recordings were not "extrinsic" because they had been admitted for another purpose (showing that Lech did not complain on the calls about pregnancy symptoms or her medical care). JA155. But that is not what "extrinsic" in Rule 608(b) means. "[E]xtrinsic evidence" is anything other than "intrinsic impeachment, that is, cross-examination" during the trial. 1 *McCormick On Evidence* §41 (8th ed.). That is why the Supreme Court admonished that "the Rule limits the inquiry to cross-examination of the witness." *Abel*, 469 U.S. at 55.

Defendants were likewise wrong to argue below that the calls, even if extrinsic, were admissible because Rule 608(b) permits specific conduct "to be inquired into" on cross-examination. JA155. That likewise ignores the difference between testimony elicited on cross-examination and extrinsic evidence. The provision allowing specific instances "to be inquired into" means defense counsel could *ask* Lech about the calls, not play recordings of them. Again, Rule 608(b) "limits the inquiry to cross-examination," and "prohibits the cross-examiner from

introducing extrinsic evidence." *Abel*, 469 U.S. at 55. Thus, if a witness denies a bad act on cross-examination, "the examiner must take the answer," *United States v. Thomas*, 467 F.3d 49, 56 (1st Cir. 2006), and cannot "introduce extrinsic evidence after [the witness] denie[s] each instance," *United States v. Simonelli*, 237 F.3d 19, 23 n.1 (1st Cir. 2001).

Finally, defendants incorrectly claimed that Rule 806 permitted the evidence. JA156. Rule 806 applies only to non-testifying hearsay declarants. The recordings here were not offered to impeach a non-testifying declarant; Lech testified. Even when Rule 806 applies, moreover, it permits only "evidence that would be admissible" to attack the witness's credibility "if the declarant had testified as a witness." As explained, when a witness testifies, extrinsic evidence is *not* admissible to attack her character for untruthfulness.

In short, admission of the recordings into evidence was unquestionably erroneous.

## III. THE MAGISTRATE JUDGE ERRED IN GRANTING SUMMARY JUDGMENT TO CRUZ

Before trial, the magistrate judge granted summary judgment for Cruz on Lech's deliberate-indifference and IIED claims. That was error.

The summary-judgment evidence was that on the night of January 1, 2014, Cruz knew that Lech was in labor, bleeding, and asking for medical attention. Cruz, who had first-responder training, also knew that a pregnant woman

experiencing vaginal bleeding requires immediate medical attention. Yet Cruz did nothing for twenty minutes, despite acknowledging that there was no security-related (or other) reason to make Lech wait for the care she needed. This evidence—certainly when viewed in the light most favorable to Lech, as it must be—would easily allow a reasonable factfinder to decide that Cruz both was deliberately indifferent and intentionally inflicted severe emotional distress.

### A. Reasonable Jurors Could Find That Cruz Acted With Deliberate Indifference In Delaying Lech's Access To Medical Care

A failure to provide medical care constitutes deliberate indifference when two conditions are met: (1) the plaintiff (objectively) had "a serious medical need"; and (2) the defendant (subjectively) knew of but disregarded a serious risk of "impending harm, easily preventable." *Kosilek v. Spencer*, 774 F.3d 63, 83, 85 (1st Cir. 2014). A reasonable factfinder, properly viewing the summary-judgment record, could find those two elements met by Cruz's delaying Lech's access to medical care *for no reason* when she knew that Lech was experiencing signs of labor, bleeding, and in pain. The magistrate judge's conclusory contrary reasoning—simply that "[t]he twenty-minute delay in transferring Ms. Lech from her cell to the medical unit while she was bleeding may have been negligence on Cruz's part, but it was not deliberate indifference," JA18—is untenable.

### 1. A reasonable jury could find that Lech had a serious medical need

As the magistrate judge recognized, "there [wa]s no dispute that Plaintiff's high-risk pregnancy with complaints of bleeding, cramping, and decreased fetal movement was a serious medical need." JA18. A serious need is one that "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Leavitt v. Correctional Medical Services, Inc.*, 645 F.3d 484, 497 (1st Cir. 2011). Here, both descriptions fit. Given Lech's history of uterine rupture, the certified nurse midwife at the WCC determined shortly after Lech's arrival there that Lech required consultation with a physician specializing in maternal-fetal medicine. JA1102. Following that consultation, the physician determined that, because of Lech's prior uterine rupture, labor would greatly increase the risk of a second rupture and should be avoided. Pl.'s Mem. ISO Summ. J Mot. ("Pl.'s MSJ") (D.Ct. Dkt. 157) at 11; *accord* JA1148. Such a rupture, in fact, would be "life threatening" to Lech and her baby. Pl.'s MSJ at 11; JA1148. Accordingly, the consulting physician recommended a scheduled delivery via cesarean section at 36 to 37 weeks "due to the risk of uterine rupture." Pl's MSJ at 11; *accord* JA1149. Given this background, Lech's symptoms of labor—including a gush of fluids, bleeding, and cramping—presented a serious medical need.

Separately, Lech's need for medical attention was objectively serious because it was "so obvious even a lay person would easily recognize" it, *Perry v. Roy*, 782 F.3d 73, 78-79 (1st Cir. 2015). The summary-judgment record showed that late on January 1, 2014, Lech—who was visibly pregnant, JA74—felt a "gushing sensation" from her vagina, a "[b]ulging" feeling, and was bleeding "like [she was] having [her] period, but … a lot worse." JA94-95. She was bleeding so heavily that her clothes were "stained" and "wet." JA95. She also experienced "a terrible painful cramping in [her] lower belly." JA143. Under those circumstances, a "layperson would … recognize[] the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 782-783, 785 (8th Cir. 1997). Indeed, a layperson *did* recognize that here; as noted, Lech's cellmate reacted to the situation by "jump[ing] off her bunk and … screaming that someone needed to help." JA144. Other circuits have likewise held that a layperson would see the need for medical attention with: bleeding and abdominal pain in a pregnant person, *Coleman*, 114 F.3d at 785; leaking amniotic fluid, *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007); or bleeding in a person six months' pregnant, *Boswell v. Sherburne County*, 849 F.2d 1117, 1122 (8th Cir. 1988). The same conclusion is warranted here.

2. *A reasonable jury could find that Cruz knew of and disregarded Lech's serious medical need*

The subjective element of deliberate indifference exists where a defendant acts with "wanton disregard" for a person's needs, meaning the defendant is subjectively aware of the need for medical attention yet fails to act. *Perry*, 782 F.3d at 81. "A state-of-mind issue" such as this "usually presents a jury question." *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991). Here, a reasonable jury considering the evidence in the light most favorable to Lech could decide that Cruz knew about and disregarded Lech's serious need for immediate medical care yet disregarded that need by making her wait in pain for twenty minutes—for no reason. That is deliberate indifference.

a. A reasonable jury could find that Cruz subjectively knew of Lech's serious medical need

The knowledge component of deliberate indifference's subjective element requires that the defendant either (1) is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "draw[s] the inference" or (2) "decline[s] to confirm inferences of risk that he strongly suspect[s] to exist." *Farmer v. Brennan*, 511 U.S. 825, 837, 843 n.8 (1994). In granting summary judgment here, the magistrate judge improperly disregarded evidence from which a reasonable factfinder could decide that Cruz either

(1) knew Lech was in labor and bleeding and that such bleeding created a serious risk of harm or (2) suspected yet failed to confirm such a risk.

As to the former, there was evidence that Cruz knew Lech was in labor and bleeding. Cruz knew Lech was pregnant, both because the "tier sheet" she reviewed so indicated and because it was "physically … evident." JA74. Cruz also received "first-responder training," which included how to recognize the "different stages of labor." JA66. That necessarily encompasses the ability to recognize the condition of labor itself. And Cruz knew Lech was experiencing signs of labor and bleeding around 10 pm on January 1, 2014. Lech testified in her deposition that around 9:55 pm, she stood up for "count time" and felt a "gushing sensation." JA94. Lech then used the intercom in her cell to call the officers' station (where Cruz was) and told Cruz that her "water broke," she was in labor, and she "need[ed] to go to the hospital." JA95. There is also evidence that when Cruz finally called the nurse on duty, Cruz told the nurse that Lech "felt a gush of fluid," which Cruz described as "bleeding." JA87. A reasonable factfinder crediting all of this evidence (as the magistrate, in evaluating the summary-judgment issue, had to assume a factfinder would do) could conclude that Cruz knew Lech was in labor and bleeding.

There was also evidence that Cruz subjectively knew that a pregnant inmate in labor and bleeding faces a serious risk of harm. Indeed, Cruz testified in her

deposition that if Lech had been "in labor and [] bleeding"—as again the evidence shows Cruz knew Lech to be—that "would have been a medical emergency." JA79. Cruz further understood that a medical emergency requires immediate attention, testifying that in an emergency, she would not "call medical" but would "call [a] medical emergency via the radio and medical w[ould] respond right away." JA72. A reasonable factfinder could thus decide that Cruz was subjectively aware that Lech faced a serious risk of imminent harm.

As to the alternative way of establishing the knowledge component of deliberate indifference, i.e., failure to confirm a suspected risk, there was evidence in the summary-judgment record that Cruz "understood that there was a high probability of a danger" to Lech and yet "'declined to confirm'" whether that possibility actually existed. *Giroux v. Somerset County*, 178 F.3d 28, 33 (1st Cir. 1999) (quoting *Farmer*, 511 U.S. at 843 n.8). As discussed, *see supra* p.38, there was evidence that, when Lech requested medical care, Cruz knew Lech was pregnant and had experienced a "gush" of fluids. Nonetheless, Cruz did not investigate Lech's condition to determine its seriousness. When asked in her deposition whether, as a matter of general practice, she "do[es] anything … to check and see if there is an emergency" when an inmate requests medical attention, Cruz responded: "It's not my job to like go inside the cell." JA72. Consistent

with that general practice, Cruz did not walk to Lech's cell to check on her when Lech requested medical attention. JA95.

This Court has held that similar failures to investigate constitute deliberate indifference. In *Giroux v. Somerset County*, a former inmate sued after being assaulted by another inmate who had previously threatened him. *See* 178 F.3d at 29. This Court reversed summary judgment for the defendant because "a reasonable juror could find" that the defendant failed to "confirm" the existence of a suspected risk of harm. *Id.* at 34. There, the evidence showed that the defendant knew the plaintiff was on "cell feed status" (meaning he was to receive meals in his cell) and knew that such status indicated either a health problem or that the plaintiff "was in protective custody" because of a risk that he "could be harmed by another inmate." *Id.* at 33. Despite that knowledge, the defendant "took no action" to identify the nature of the risk. *Id.* This Court held that the evidence that the defendant was aware of facts suggesting a risk of harm yet failed to investigate precluded summary judgment. So too here.

Case law outside this circuit is to the same effect. Indeed, in *Goebert v. Lee County*, the Eleventh Circuit reversed summary judgment under facts very similar to those here. *See* 510 F.3d at 1316-1320, 1331. There too, a pregnant inmate was leaking fluids from her vagina. *Id.* at 1317. And as here, the inmate contacted a prison official requesting to see a doctor. *Id.* at 1318. Also as here, the prison

official—despite being aware that the plaintiff was pregnant and leaking fluids—did not investigate the severity of her condition or provide immediate medical attention. *Id.* at 1320, 1327. The Eleventh Circuit held that those facts could support a deliberate-indifference verdict because the official "had a duty to look into the matter" and failed to do so. *Id.* at 1328. Likewise here, a reasonable jury could find that when Lech told Cruz her water broke, Cruz had a duty to investigate. The jury could also find that Cruz's blind eye and callous refusal to even enter Lech's cell made Cruz deliberately indifferent to Lech's serious medical need.

> b. A reasonable jury could decide that Cruz's unjustified delay in allowing Lech access to medical care constituted deliberate indifference

Finally, summary judgment on this claim was inappropriate because there was evidence in the summary-judgment record that, despite Cruz's subjective knowledge of Lech's risk of harm, Cruz delayed Lech's access to medical care for no legitimate reason.

"The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Harris v. Coweta County*, 21 F.3d 388, 393-394 (11th Cir. 1994). Even a short delay can therefore constitute deliberate indifference if the delay harmed or risked substantially harming the plaintiff and was not "objectively reasonable given the

circumstances." *Perry*, 782 F.3d at 80. Or as another circuit has put it, a "substantial risk of serious harm" from delay in treatment for "non-medical reasons" violates the Eighth Amendment. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004).

Here, Lech was forced to wait—in labor, bleeding, and in pain—for roughly twenty minutes before Cruz allowed her to receive medical attention. A reasonable factfinder could decide that that delay harmed or risked harming Lech and thus constituted deliberate indifference.

*First*, the evidence shows Lech was "in immense pain" JA144, with "a lot of cramping," while waiting for Cruz to contact medical, JA95. She was also "terrified," afraid her baby "was d[y]ing" but unsure "what was going on." JA95-96. Such "pain and suffering and mental anguish" associated with going into labor in a jail cell "without the appropriate medical attention" can itself support a deliberate-indifference verdict. *Coleman*, 114 F.3d at 786-787. That is because "[t]he pain suffered during a delay in treatment can constitute a substantial harm." *Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (per curiam).

*Second*, a reasonable jury could separately find Cruz deliberately indifferent because the summary-judgment record showed that Lech faced a risk of further serious harm from treatment being delayed. A risk of future harm can support a

deliberate-indifference claim where the plaintiff faced "an actual risk of harm" that is not "hypothetical or abstract." *Abernathy v. Anderson*, 984 F.3d 1, 7 (1st Cir. 2020) (per curiam). Here, a reasonable jury could find the delay in care created an actual risk of harm because there was "evidence in the summary judgment record showing what future harm could have consisted of" and that that harm was likely in the absence of immediate care. *Id.* at 8.

Specifically, the summary-judgment record showed that during her twenty-minute wait for medical attention, Lech was bleeding so heavily that a sanitary "pad couldn't absorb all the liquid because it was coming so quickly." JA143-144. Cruz's delay thus created a risk of substantial blood loss. Moreover, evidence of Lech's condition by the time she finally reached the hospital shows that "time was of the essence" in preventing serious harm. *Goebert*, 510 F.3d at 1329. Lech was still bleeding when she reached the hospital, and was diagnosed with an infection of the placenta and amniotic fluid. Pl.'s SOF (D.Ct. Dkt. 156); JA1253-1254, 1296. Additionally, her labor had progressed so much that "soft tissue" from her son's head was "protruding through [her] cervix." Pl.'s SOF ¶171; *accord* JA1253. Given Lech's prior uterine rupture, that advanced stage of labor presented the immediate and "life threatening" risk of a second rupture. Pl.'s MSJ at 11; *accord* JA1148. A reasonable jury could find that under these

circumstances, delaying Lech's access to medical care even for twenty minutes created a risk of serious harm.

Case law is consistent with that conclusion, recognizing that where an inmate's need for care is great, "[e]ven a brief delay may be unconstitutional." *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005). Indeed, courts routinely hold that delays of mere minutes support deliberate-indifference claims where an inmate's need for emergency care was apparent. One court, for example, held last year that evidence that a prison guard was aware an inmate was unresponsive yet "waited ten minutes, completing his security check before seeking medical assistance," precluded summary judgment. *Estate of Beauford v. Mesa County*, 35 F.4th 1248, 1267 (10th Cir. 2022). Courts have also deemed a ten-minute delay sufficient to defeat summary judgment when it follows an attempted hanging, *Bradich ex rel. Estate of Bradich v. City of Chicago*, 413 F.3d 688, 691-692 (7th Cir. 2005), or a heart attack, *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001). And the Eleventh Circuit has held that where there is evidence that a defendant knows an inmate needs urgent medical attention, "fail[ing] for fourteen minutes to check [the inmate's] condition [or] call for medical assistance" can support a deliberate-indifference verdict. *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

The lack of any legitimate reason for the delay here confirms that Lech had a triable claim. Prison officials must of course account for security concerns, and hence a delay in providing medical care even in the face of a known risk of harm might not be a constitutional violation if the delay is due to "balancing judgments [that] are within the realm of reason and made in good faith." *Battista v. Clarke*, 645 F.3d 449, 454 (1st Cir. 2011). But the summary-judgment record here showed no security concern. Cruz testified that there would have been no security risk from letting Lech out of her cell to go to Medical. JA77. And the evidence showed that inmates can be sent to Medical during a count when "necessary." JA84. A reasonable factfinder could therefore decide that Cruz's "unnecessary delay" in allowing Lech to access medical attention "constituted deliberate indifference to [her] serious medical need." *Coleman*, 114 F.3d at 786. In fact, courts have affirmed the denial of summary judgment based on a delay in transferring an inmate in labor to the hospital. *Id.* The same result is required here.

## B. Reasonable Jurors Could Conclude That Cruz's Conduct Was Sufficiently Extreme To Constitute IIED

As with Lech's deliberate-indifference claim, the magistrate judge granted summary judgment for Cruz on Lech's IIED claim in a single sentence, stating that:

> Because the bar for IIED *may* be as high as the standard for a finding
> of deliberate indifference, and the court has found that Plaintiff has
> not shown that Cruz was deliberately indifferent to Plaintiff's serious
> medical needs, Plaintiff has not shown that the delay she attributes to
> Cruz rises to the level of IIED.

JA19 (emphasis added) (citation omitted). That ignores both the elements of

Lech's IIED claim and the summary-judgment record—which, viewed in the light

most favorable to Lech, showed that Cruz delayed Lech's access to medical care

knowing that Lech was in labor, bleeding, and in pain. A reasonable factfinder

could conclude that such facts constituted IIED.

To prove IIED under Massachusetts law, a plaintiff must show (1) that the

defendant "intended, knew, or should have known that [her] conduct would cause

emotional distress; (2) that the conduct was extreme and outrageous," meaning

"beyond all possible bounds of decency, … atrocious, and utterly intolerable in a

civilized community"; "(3) that the conduct caused emotional distress; and (4) that

the emotional distress was severe." *Polay v. McMahon*, 10 N.E.3d 1122, 1128

(Mass. 2014). At summary judgment, the defendant's conduct should be viewed in

"as harsh" a light "as the basic facts would reasonably allow." *Vittands v. Sudduth*,

730 N.E.2d 325, 335 (Mass. App. Ct. 2000). If "'reasonable people could differ on

whether the [defendant's] conduct is' 'extreme and outrageous,'" summary

judgment is inappropriate. *Id.*

Here, a reasonable jury, viewing Cruz's conduct in as harsh a light as the evidence would reasonably allow, could find that (1) Cruz knew her conduct would cause emotional distress and (2) the conduct was extreme and outrageous. As discussed, the summary-judgment record showed that Cruz knew Lech was pregnant, that her water broke, that she was bleeding, and that she requested medical attention. JA74, 91, 95, 144. To this, Cruz responded simply that Lech "was fine." JA95, 144. And when Lech insisted she was "not ok and needed help," Cruz did not check on Lech but instead told her "to wait" and that Cruz would "contact medical staff after head count." JA144; *accord* JA95. Reasonable jurors could find this conduct—"fail[ing] to examine" and delaying medical attention for an inmate with a known serious medical need—extreme and outrageous. *Griffin v. Mortier*, 837 F.App'x 166, 173 (4th Cir. 2020) (per curiam); *accord Dixon v. County of Cook*, 819 F.3d 343, 351 (7th Cir. 2016).

There was also evidence that Cruz's delay caused Lech severe emotional distress. Lech waited in her cell for "about twenty minutes," "bleeding," "in pain," and "terrified about what could be happening to [her] baby." JA144. She was "[d]istraught, scared, [and] worried" because she "thought [her baby] was d[y]ing" and "didn't know what was going on." JA95-96. A reasonable factfinder could decide that the fear that one's unborn baby is dying and that no one is coming to help—when there is no ability to obtain help for oneself—is "severe" emotional

distress "of such a nature that no reasonable person could be expected to endure it," *Limone v. United States*, 579 F.3d 79, 94 (1st Cir. 2009). Summary judgment on Lech's IIED claim was accordingly improper.

## IV. NONE OF THE JUDGE'S ERRORS WAS HARMLESS

Each error discussed above requires reversal unless "it is 'highly probable' that the error did not contribute to the verdict." *Kilmartin*, 944 F.3d at 338. That standard is not met here as to any of the errors. And even if it was, "[c]umulative errors may merit a reversal if they achieve a 'critical mass' that 'cast[s] a shadow upon the integrity of the verdict.'" *Burgos-Montes*, 786 F.3d at 114. That is assuredly the situation here, where the magistrate judge's errors inflicted related harm on Lech's case. The errors—both individually and in combination—very likely affected the jury's verdict, and it is certainly not highly probable that they didn't. Reversal is therefore required.

### A. Exclusion Of Zygmont's Testimony

The magistrate judge's exclusion of Zygmont's testimony was not harmless. Zygmont's testimony was crucial evidence supporting Lech's effort to rebut defendants' argument that Lech was lying in claiming that in the ten-day period before she was finally taken to the hospital, she repeatedly complained to WCC medical staff and requested to go to the hospital but was ignored.

This argument was the absolute heart of defendants' case, from the start of trial to the end. Defense counsel framed the case as Lech's word against everyone else's, and in doing so repeatedly emphasized the purported lack of evidence corroborating Lech's testimony. For example, counsel told jurors in opening statements that they were "going to hear two stories," one of which "is the story that was alleged in Ms. Lech's complaint," and the other of which "is told by the seven medical professionals who treated Lidia Lech," "is also told by the medical records," and "is also the same story that is told by Lidia Lech's own recorded phone calls." JA293. With respect to the recorded calls, defense counsel said the true story is told by what Lech "doesn't say," JA298—namely, that she "thinks she needs to go to the hospital, … has asked the medical providers to send her to the hospital and they have refused." JA300-301. Counsel closed the trial with the same message, contrasting for the jury the story they heard "in this courtroom from Lidia Lech"—and no one else—with "the story told to you by the medical providers," which was the "same true story [told] through the medical records" and also "told through Lidia Lech's recorded phone conversations." JA920-921. And counsel called on the jury to focus on the lack of evidence corroborating Lech's testimony, emphasizing that "[t]he conflicts between Ms. Lech's story and virtually all of the other evidence in this case is why such an important part of your job as jurors is deciding who is telling the truth." JA938.

That argument would have been far less compelling had the magistrate judge admitted Zygmont's testimony about what Lech told him, testimony that would have greatly bolstered Lech's testimony by providing precisely the corroboration that defense counsel suggested again and again was missing. Zygmont's testimony also would have rebutted defendants' related argument (likewise made repeatedly to the jury) that the recorded phone calls showed Lech did *not* tell others about any medical difficulties or requests to go to the hospital—revealing that she did just that with Zygmont. The jury, moreover, could easily have found it credible that Lech confided more in Zygmont about her medical issues and requests to go to the hospital than she did with people she spoke with on the recorded calls. As Lech testified, she did not tell her family because "[t]hey would always say that I'm fine," JA444, and she did not tell her boyfriend because he was not "a particularly sympathetic ear" and simply "didn't care," JA444, 446. Zygmont, by contrast, was the only person who made the effort to visit her, and the one she felt she could confide in about these issues. JA448. As Lech's counsel put it to the magistrate judge, Zygmont's testimony would have been "very important evidence" because it would have come from "the only single person who visited her in jail." JA777.

Worse still, the judge's limitation on Zygmont's testimony meant that the jury heard about his visits *without* hearing the corroborating aspects of his testimony. That likely implied to the jury, wrongly, that Lech actually said nothing

to Zygmont about issues with her pregnancy or WCC staff, which would be further evidence bolstering the defense's argument that there was no such corroboration. The exclusion, in other words, likely misled jurors into thinking that Zygmont's conversations with Lech—which in reality supported her version of events— instead undermined it.

Lech's counsel raised this issue, telling the magistrate judge that "the jury might wonder why isn't Zygmont saying exactly what Ms. Lech said," JA799. Yet the judge refused to instruct the jury that Zygmont could not repeat what Lech told him; in the judge's words, that "would be an implication from the court that there is *relevant evidence* that's being withheld from them, and I don't want to instruct the jurors to that effect." *Id.* (emphasis added). That comment starkly (though no doubt unintentionally) confirms that the judge's error was not harmless, confirming that "relevant evidence" *was* being withheld. In fact, given that the defense made the case into a credibility battle, the evidence was not just relevant but critical— and its exclusion was not remotely harmless. *See United States v. Soler-Montalvo*, 44 F.4th 1, 19-20 (1st Cir. 2022).

That is all the more true given that the bolstering of Lech's credibility that the excluded Zygmont testimony would have accomplished would have pertained not just to the issue of whether Lech made pleas for medical attention that were ignored. It also would have pertained to the issue of how long defendants delayed

in addressing Lech's serious medical need, which was central to determining whether defendants showed deliberate indifference, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In particular, Zygmont's testimony would have corroborated Lech's account of a long period of unjustified delay by defendants—at least several days, and starting before December 26—in providing Lech the medical treatment she needed. For this reason too, the exclusion of the testimony cannot be deemed harmless.

**B.    Admission Of The Recorded Calls As Character Evidence**

As with the Zygmont testimony, it is not "highly probable" that the admission of extrinsic recordings to portray Lech as a liar "did not contribute to the verdict" here. *Kilmartin*, 944 F.3d at 338. Whether alone or in combination with the exclusion of the very similar evidence Lech proffered (her corroborating statements to Zygmont), the admission of those recordings could easily have contributed to jurors' decision to credit defendants' testimony and not Lech's.

As explained, the trial turned on whom the jury believed, and hence defendants' core strategy was to discredit Lech. This made the character evidence of Lech's supposed untruthfulness critical. Indeed, after succeeding in having the recordings admitted and thoroughly cross-examining Lech about them, defendants (in addition to again raising the seeming fact that Lech's testimony was not

"corroborated") emphasized the character evidence in closing arguments, referring

to the recordings in saying:

> It is not just Ms. Lech's memory you should consider when assessing her credibility, … you have to take into consideration Ms. Lech's own admission that she was telling lies[.]  She was lying to her mother and her brother, lying to them about her probation violation, trying to make herself look better, lying about her boyfriend, trying to make him sound like he was sober and getting his life together.  As to Joe, she testified that she was lying to her family to protect Mr. Challet from her family's judgment.  But if she'll lie to her mother and brother to protect the honor of someone like Mr. Challet, wouldn't she also lie here where the stakes are a heck of a lot higher for her?

> And you have to contrast that with the Defendants[.]  Their testimony was corroborated by all of the percipient witnesses[.]  *Unlike Ms. Lech, there was no evidence produced that any of these Defendants were lying or had a habit of casually lying for their own benefit.*

JA939-940 (emphasis added).

"[T]he great emphasis placed on" this evidence "by the defendants, both

during their examination of [Lech] and during their closing arguments," under-

scores that the admission of the evidence was not harmless.  *McInnis v. A.M.F.,*

*Inc.*, 765 F.2d 240, 251 (1st Cir. 1985); *accord Vincent v. Louis Marx & Company*,

874 F.2d 36, 41 (1st Cir. 1989) (rejecting a harmless-error argument where the

relevant evidence "was highlighted by defense counsel in his closing argument").

In fact, where a defendant has "specifically mentioned" improperly admitted

evidence "in both its opening and closing arguments," this Court has rejected a

harmless-error argument even where the evidence "was not the primary focus of

[defendant's] case." *Fleet National Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 555 (1st Cir. 1995).

The harm from admitting the recordings, moreover, is amplified by (and amplifies) the harm from the related exclusion of Zygmont's proffered testimony about what Lech told him. "There is a synergy between the two errors …, with each error magnifying the impact of the other." *United States v. Brissette*, 2020 WL 718294, at *44 (D. Mass. Feb. 12, 2020). These errors were a powerful combination in a case that turned principally on Lech's credibility: Lech was prevented from introducing the corroborating contemporaneous testimony that would have greatly undermined defendants' claim that she was fabricating her story, while defendants were improperly permitted to play recordings of *other* contemporaneous statements unrelated to the events at issue to suggest Lech was a liar. While each error was harmful on its own, this Court cannot ignore "their interrelationship," which further "produc[es] a total impact greater than the arithmetic sum of its constituent parts," *United States v. Padilla-Galarza*, 990 F.3d 60, 85 (1st Cir. 2021).

In short, because this case was largely if not entirely a credibility battle, the Court cannot deem it "highly probable," *Kilmartin*, 944 F.3d at 338, that the jury would have resolved that dispute the way it did had the magistrate judge not allowed defendants to introduce recordings painting Lech as a liar while she

simultaneously prevented Lech from introducing the key testimony she offered (through Zygmont) to corroborate her version of events. *See United States v. Ford*, 821 F.3d 63, 76 (1st Cir. 2016).

## C. Summary Judgment

In light of the magistrate judge's evidentiary errors, the grant of summary judgment in Cruz's favor also cannot be deemed harmless. To be sure, the jury found Cruz not liable at trial for negligence. But a defense verdict on one claim does not mean that the dismissal of another, related claim was harmless *unless* it is "perfectly clear" that "the outcome would have been in the defendants' favor" had the dismissed claim been presented to the jury. *In re Nexium (Esomeprazole) Antitrust Litigation*, 842 F.3d 34, 62 (1st Cir. 2016). In light of the evidentiary errors discussed above, there can be no such clarity here.

As with the case as a whole, Lech's credibility was central to the negligence claim against Cruz. And there was ample evidence presented at trial from which a reasonable jury could find that Cruz was negligent in not seeking immediate medical attention for Lech. Lech testified at trial that she was bleeding so heavily that, despite wearing a sanitary pad, blood was visible on her clothes; that she told Cruz her "water broke" in a "tone [of] panic;" and that when Cruz asked if Lech could wait until morning, Lech told Cruz she could not wait because "the baby's coming." JA469-471, 480-481, 487. Crediting that testimony, a jury could find

that Cruz did "not act[] reasonably under the circumstances" by needlessly delaying Lech's access to medical care for twenty minutes, JA983.

The magistrate judge's erroneous evidentiary rulings, however, allowed defendants to call Lech's account into question. And as with Lech's other claims, credibility was everything to the jury's resolution of Lech's negligence claim. Defense counsel emphasized in closing, for example, that "Lech's version of events" on the night of January 1 was "contradicted by the account of Officer Cruz." JA936-937. And, as discussed, *see supra* pp.52-53, defendants' closing argument hammered Lech's supposed propensity for untruthfulness. Given the centrality of credibility, "it can[not] be said that the [negligence] judgment was not substantially swayed" by the evidentiary errors that undermined Lech's credibility. *Burgos-Montes*, 786 F.3d at 114 (quotation marks omitted). The verdict on the negligence claim therefore does not render harmless the grant of summary judgment to Cruz on Lech's deliberate-indifference and IIED claims.

## CONCLUSION

The Court should reverse the grant of summary judgment to Cruz on Lech's deliberate-indifference and IIED claims, vacate the judgment on all the claims that were tried, and remand for a new trial.

June 16, 2023                                  Respectfully submitted,

                                               /s/ *Daniel S. Volchok*

JOHN R. GODLESKI                               DANIEL S. VOLCHOK
277 Main Street, Suite 300                     ALLISON M. SCHULTZ
Greenfield, MA 01301                           JOSEPH M. MEYER
(413) 695-8790                                 MICHAEL MOORIN
                                               WILMER CUTLER PICKERING
                                                  HALE AND DORR LLP
                                               2100 Pennsylvania Avenue N.W.
                                               Washington, D.C. 20037
                                               (202) 663-6000

# ADDENDUM

**TABLE OF CONTENTS**

Final Judgment, Dkt. 279 (June 8, 2022)……………………………………………………Add. 1

Transcript of Ruling Excluding Zygmont Testimony, Dkt. 323 (May 17, 2022)…………...Add. 3

Transcript of Ruling Admitting Character Evidence, Dkt. 315 (May 16, 2022)…………..Add. 19

Order Granting Summary Judgment to Natalie Cruz, Dkt. 193 (Apr. 11, 2022)…………..Add. 22

Federal Rule of Evidence 608………………………………………………………………...Add. 28

Federal Rule of Evidence 801………………………………………………………………...Add. 29

Federal Rule of Evidence 803………………………………………………………………...Add. 31

Federal Rule of Evidence 806………………………………………………………………...Add. 36

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIDIA LECH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action  No. 17-cv-30024 (KAR) |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOROTHEA VON GOELER, M.D, | ) | |
| BAYSTATE MEDICAL | ) | |
| PRACTICES, INC., | ) | |
| HAMPDEN COUNTY | ) | |
| SHERIFF'S DEPARTMENT, | ) | |
| MARIA DIAZ, | ) | |
| NICOLE SKORUPSKI, | ) | |
| ELIZABETH MEAUX, | ) | |
| SHANTELLE ROSADO, | ) | |
| JULIE BELLE-ISLE, | ) | |
| LYNN CHASE, | ) | |
| MICHAEL J. ASHE, JR., | ) | |
| NICHOLAS COCCHI, | ) | |
| PATRICIA MURPHY, | ) | |
| NATALIE CRUZ, and | ) | |
| MICHAEL VANCINI, | ) | |
| | ) | |
| Defendants. | ) | |

JUDGMENT IN A CIVIL CASE

 X    Jury Verdict.  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

____  Decision by the Court.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED:

Pursuant to the Court's ruling on the motion for a directed verdict filed on behalf of

defendants Michael Ashe, Jr. Patricia Murphy and Nicholas Cocchi and pursuant to the Jury

Verdict (ECF No. 276) following trial, judgment is entered against Plaintiff and in favor of Defendants Dorothea Von Goeler, Baystate Medical Practices, Inc., Hampden County Sheriff's Department, Maria Diaz, Nicole Skorupski, Elizabeth Meaux, Shantelle Rosado, Julie Belle-Isle, Lynn Chase, Michael J. Ashe Jr., Nicholas Cocchi, Patricia Murphy, Natalie Cruz and Michael Vancini, on all claims against Defendants.

IT IS SO ORDERED.

ROBERT M. FARRELL
CLERK OF COURT

Dated:  June 8, 2022

*Melissa M. Rivera*

Melissa M. Rivera
Deputy Clerk

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   LIDIA LECH,                      )
                                      )
 4                    Plaintiff       )
                                      )  No. 3:17-CV-30024-KAR
 5   vs.                              )
                                      )
 6   DOROTHEA VON GOELER, et al.,     )
                                      )
 7                    Defendants.     )
                                      )
 8                                    )
                                      )
 9

10

11            BEFORE THE HONORABLE KATHERINE ROBERTSON
                   UNITED STATES MAGISTRATE JUDGE
12                          JURY TRIAL
                              DAY 7
13

14

15

16                    United States Courthouse
                         Hampshire Courtroom
17                        300 State Street
                     Springfield, Massachusetts 01105
18

19                        May 17, 2022
                           9:16 a.m.
20

21

22                    Kristin M. Kelley, RPR, CRR
                         Official Court Reporter
23        John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 3209
24                    Boston, Massachusetts 02210
                       E-mail: kmob929@gmail.com
25
             Mechanical Steno - Computer-Aided Transcript
```

1  correct?

2  A.   Correct.

3  Q.   And you went on to tell him that "it's like getting hard

4  and then it gets soft and then it gets hard".  You at least

5  described that, correct?

6  A.   I said yes already before.

7  Q.   You didn't tell him about any other pain, is that right?

8  A.   Why?  He doesn't care.  He didn't care.  I stopped talking

9  about it.

04:01 10  Q.   You didn't stop talking about it until you said "they are

11  not painful.  It doesn't hurt", correct?

12           MR. ROUNTREE:  Objection.

13  A.   I said what I said, and then he didn't care, so I didn't

14  continue.

15           MR. GIORDANO:  Your Honor, I do have a little bit

16  more, but if you want to take the break for today, that's fine.

17           THE COURT:  It is four p.m.  I think we should take

18  the break for today.  This can be wrapped up probably

19  reasonably tomorrow morning.

04:02 20           Don't read about the case if there's anything to read

21  about the case and we will see you all tomorrow morning.  Thank

22  you very, very much.

23           THE CLERK:  All rise for the jury.

24           (Jury exits.)

25           THE COURT:  I want to deal with the letter so the

parties will know.  I'm looking at the rule and there are

advisory notes to the rule.  The advisory notes provide that,

among other things, that the amendment, there was a 2014

amendment, which the change made by the 2014 amendment was that

a prior consistent statement could come in for its truth in

addition to as bearing on the declarant's credibility.  That

was the change in 2014, but the advisory notes say that the

amendment does not change the traditional and well accepted

limits on bringing prior consistent statements before the fact

finder.  For credibility purposes, it does not allow

impermissible bolstering of a witness as before prior

consistent statements under the amendment may be brought before

the fact finder only if they properly rehabilitate a witness

whose credibility has been attacked on cross-examination.

The thing I'm having trouble seeing here -- I have to

say that Mr. Giordano's cross-examination comes a little closer

to attacking the declarant's credibility, but I do not

recall -- for example, Ms. Olanoff, just by way of example --

and I'm picking on Shantelle Rosado -- is she here?  She left?

Good choice.  What I don't recall is Ms. Olanoff putting the

notes up of Ms. Rosado and saying, isn't it true that the notes

here don't show any statement to Ms. Rosado about bulging in

your abdomen, cramping, pain, vaginal discharge or a plea to go

to the hospital.  In other words, she did not challenge the

credibility of Ms. Lech with respect to those statements.  And

1   Ms. Lech testified to those statements on direct.  She did

2   testify that she told all of the nurses and the nurse

3   practitioners, and those are the majority of the care providers

4   that she saw at the jail.

5          So she was really not challenged on cross-examination

6   about her credibility with respect to those statements.  The

7   notes say as well, if the opposite party wishes to open the

8   door for the admission of a prior statement in evidence, no

9   sound reason is apparent why it should not be received and

04:05 10   received generally for substantive purposes.

11          It seems to me, that at least with respect to the

12   Hampden County Sheriff's Department defendants, there was

13   perhaps a deliberate decision not to challenge Ms. Lech with

14   respect to on cross-examination with respect to those

15   statements, and that is the prerequisite for the operation of

16   Rule 801(d)(1)(B).

17          MR. ROUNTREE:  Can we be heard, your Honor?

18          THE COURT:  I have looked at everything the parties

19   have submitted.  I have listened to the parties on this point.

04:06 20   I will give you five minutes.  Go ahead.  Either you or

21   Mr. Godleski.  Whether or not Mr. Day raised this question

22   after all in his opening statement, that's not evidence.

23          MR. ROUNTREE:  I understand that, but then that would

24   preclude them from arguing in summation that there is a

25   credibility issue.

THE COURT:  No, it would not.  You can object to my
ruling, but it would not foreclose them from arguing on the
basis of testimony that they do not elicit from the declarant
on cross-examination but that they elicit from other witnesses
that there is a credibility problem.

The general rule, again, is we don't bolster the
witness's testimony with a prior consistent statement, which is
what the plaintiff is asking for.

MR. ROUNTREE:  Unless there is a claim of recent
fabrication.

THE COURT:  Not unless.  Then it's up to the
discretion of the Court.

MR. ROUNTREE:  Of course.  Everything's up to the
discretion of the Court.

THE COURT:  Again, I just don't see the challenge on
cross-examination.

MR. ROUNTREE:  I just want to point out that during
cross-examination, again and again and again and again,
Ms. Olanoff used transcripts, waved them around the courtroom,
said there's nothing in these transcripts that say that you
wanted to go to the hospital, again and again and again.  It
was repeated.  There was nothing in this transcript that
said -- show me in this transcript.  And this happened
repeatedly.  Show me in this transcript where you said on these
phone calls that you wanted to go to the hospital.

1      There's our fine line.  There's our distinction.  Is

2  there nothing in the phone calls?  Yeah, absolutely.  There's

3  nothing in the phone calls, but she said it to a person who

4  came and sat with her during a visit.  She said, I want to go

5  to the hospital.

6      The argument is going to be, and the Court is

7  considering precluding very important evidence, the argument is

8  going to be she never said to anybody that she wanted to go to

9  the hospital.

04:08 10      THE COURT:  She has testified that she said it.  I'm

11  considering this to be principally -- she's explained,

12  Mr. Rountree, and I think explained pretty clearly, why she did

13  or didn't go -- why she did or didn't talk to family members,

14  and she was given adequate and ample opportunity to talk about

15  why her family was not receptive to hearing those things.

16      The critical questions here, I think, are whether or

17  not those statements were made to the care providers.  She was

18  not challenged on cross-examination with respect to those

19  statements to the care providers.

04:09 20      MR. ROUNTREE:  She was challenged on statements to

21  anybody, so we're talking civilians.  The distinction is care

22  providers, civilians.  She was challenged on statements to

23  civilians related to whether or not she wanted to go to the

24  hospital.  When the only single person who visited her in jail,

25  the only one, can come in and testify and say, I sat with her

1   for hours and talked to her and she was upset and she was

2   worried and she said to me, I want to go to the hospital, that

3   is probative of the fact that there is not a recent fabrication

4   with respect to that discrete portion of evidence.  That's the

5   only reason, with a curative instruction of course, that we

6   would want to introduce that.

7           THE COURT:  Mr. Day?

8           MR. DAY:  Yes, your Honor.  A couple things.  First of

9   all, the requirements of the Rule 801(d)(1), in order to apply

04:10 10  under 801(d)(1), she has to have testified to the subject.  On

11  direct examination, she was asked specifically about December

12  26 and her meeting with Mr. Zygmont on December 26.  I don't

13  believe there was any objection from us as far as that goes.

14          MR. ROUNTREE:  She was --

15          MR. DAY:  I'm in the middle of an argument.

16          THE COURT:  I don't think I would have permitted her

17  to testify to a conversation with Mr. Zygmont.

18          MR. DAY:  I don't have the transcript.  December 26,

19  "Did you tell Al about the medical situation on December 26?"

04:10 20  Her answer was "Yes."

21          MR. ROUNTREE:  There was a motion in limine.  She was

22  precluded from eliciting that evidence on direct examination.

23          THE COURT:  Let's move on.

24          MR. DAY:  That's specifically in my notes from --

25          THE COURT:  My point was, let's leave that for

1    rebuttal and see what develops on cross-examination. That was

2    my ruling. So I do not believe I would have permitted, nor do

3    I believe plaintiff's counsel would have failed to comply with

4    my instructions that they couldn't really elicit that

5    testimony, unless and until we got to sort of the rebuttal

6    portion of the case and we had heard the cross-examination with

7    respect to whether or not.

8              In every single case, there's going to be a

9    credibility contest. In every case, there is a credibility

04:11 10    case. In every case, there is a credibility contest. If the

11    exception is as broad as the plaintiff is making it out to be,

12    then these prior consistent statements would come in in every

13    case in which there is a dispute about the accuracy of

14    someone's testimony about what she or he said at an earlier

15    time.

16              MR. DAY: Your Honor, may I also say --

17              THE COURT: Just wait.

18              MR. ROUNTREE: This is very discrete.

19              THE COURT: Wait. I don't really agree with that.

04:12 20              MR. DAY: Your Honor, Mr. Zygmont's testimony at

21    deposition -- the other thing under 801(d)(1)(B) is

22    Mr. Zygmont's testimony must be consistent. Mr. Zygmont's

23    testimony at deposition was she saw a nurse, she told me that

24    she saw a nurse and the nurse said take two aspirin, I'll see

25    you in the morning. That was his testimony at deposition.

1    So if he's going to come in here and testify now that,

2  oh, she told me she needed to go to the hospital, that's not

3  what his testimony was at deposition.

4    THE COURT:  Did you ask him if that was everything he

5  remembered her saying?

6    MR. GODLESKI:  No, he wasn't.

7    MR. DAY:  I can grab his transcript.  I can tell you

8  that's what he testified to as to the meeting with Ms. Lech on

9  the 26th.  He hasn't testified -- she hasn't testified to that

04:13 10  specifically, maybe because it was precluded.

11    THE COURT:  The testimony is about the conversation

12  with a nurse, not a conversation with a family member.

13    MR. ROUNTREE:  There is transcript testimony, I

14  believe, where he says, she asked me to go to the hospital.

15  She said, I need to go to the hospital.

16    THE COURT:  Sure, sure, but that's an out of court

17  statement offered for its truth.

18    MR. ROUNTREE:  Of course, but the attack on all the

19  civilian witnesses was that she never said it to somebody and

04:13 20  she did.  So I would submit that it's a very discrete and

21  direct rebuttal.  We didn't elicit it because we were

22  precluded.

23    THE COURT:  Of course.  I understand that.

24    MR. ROUNTREE:  We have a transcript.

25    MR. GODLESKI:  "There was a time I went to visit her

1    and she complained about, she felt she could no longer feel the

2    baby.  There was no movement.  I think this is one of the

3    meetings at which I was asked to talk to anybody at the jail."

4         Then he goes on.  "She basically says yes, she has.

5    Basically, she said me, yeah, somebody, whether it be a nurse

6    or a doctor, told me to take two aspirins and told me to see me

7    in the morning.  She mentioned several times that she felt

8    there was definitely something wrong."

9         MR. DAY:  There's nothing about the hospital.

04:14 10         THE COURT:  That's the testimony about the

11    communication with the nurses about which there was no

12    cross-examination.

13         MR. DAY:  And, your Honor, that is what the question

14    was.  That is exactly what I was referring to.

15         "Has Lidia ever discussed with you her position

16    regarding the quality of the medical care she received at the

17    Women's Correctional Institute?"

18         "Yes."

19         "Okay.  What has she told you about that?"

04:15 20         That's when he starts.  He never says, she told me she

21    wanted to go to the hospital and they refused to send her to

22    the hospital, if he testifies consistent with his deposition,

23    because he was asked what did she tell you about that.

24         THE COURT:  I think more importantly, the focus --

25    again, I agree that the defendant -- I agree that the Hampden

1     County Sheriff's Department has inquired about whether or not

2     Ms. Lech asked family members to assist her with going to the

3     hospital, but the testimony that you're proposing to elicit

4     from Mr. Zygmont, according to deposition, is whether or not

5     she told any nurse or doctor at the jail that, that she had

6     asked to go to the hospital.  Apparently, in his word, however

7     you want to characterize it, but essentially they ignored her

8     requests and did not pay any attention to it.

9          MR. ROUNTREE:  This is the person who took her in.

04:16 10   He's as close to a family member.

11         THE COURT:  What does that have to do with whether or

12    not the testimony is admissible?  If anything, that's not

13    the -- the question is, was there testimony elicited on

14    cross-examination that called into question her testimony, her

15    statement that she asked.

16         For example, I'm just using this as an example,

17    Shantelle Rosado, there were other nurse practitioners and

18    Dr. Von Goeler, but particularly other nurse practitioners

19    where the notes say nothing about a request to go to the

04:16 20   hospital.  They say nothing about -- they say little, if

21    anything, about some of the other symptoms that she is quite

22    clear that she told people about.

23         So what you are proposing to offer Mr. Zygmont's

24    testimony, the purpose for which you are proposing to offer the

25    testimony, is to bolster her testimony that she told these

1  nurses that she wanted to go to the hospital and that they

2  ignored her.  There's not cross-examination on that point by

3  Ms. Olanoff.

4      MR. ROUNTREE:  The only reason we want to do it, your

5  Honor, is to rebut the claim of fabrication, and that is why

6  it's relevant.

7      THE COURT:  I understand the argument.  I do

8  understand the argument.  First, given the purpose of the

9  testimony and the nature of the testimony, it's not clear to me

04:17 10  that the prerequisite of cross-examination on the topic on

11  which the prior consistent statement would be offered had been

12  raised on cross-examination.

13      Second, I am hesitant and would exercise my discretion

14  to exclude it on the basis of the fact that this is the kind of

15  bolstering evidence that has been deemed problematic by courts.

16  Of course, you and I have many experiences in state court with

17  the first complaint rule, the second complaint rule, the fact

18  that that was, in fact, a carefully carved exception the DSJC

19  tried over and over to get right out of concern that it's not

04:18 20  appropriate to admit prior, evidence of a prior statement to

21  bolster the witness's testimony with respect to complaints that

22  she made about.

23      MR. ROUNTREE:  I think with an appropriate curative

24  instruction it is appropriate to rebut a claim of recent

25  fabrication, and that probably would happen down the street, I

1   must say.  It is what it is.  I think it's relevant material

2   evidence and should come in.  The claim from the very first

3   minute of this trial has been that this claim to go to the

4   hospital and get medical treatment is a fabrication.

5           THE COURT:  That was not on cross-examination.

6           MR. ROUNTREE:  I understand.  Cross-examination raised

7   that issue again and again and again.  It really did.

8           THE COURT:  But not with respect to any medical care

9   provider, not with respect to the nurses.  In other words, what

04:19 10  Mr. Zygmont is asked, and what I suppose he'd be testifying to,

11  is not whether she asked her family members to go to the

12  hospital but whether or not she asked care providers, medical

13  care providers at the jail, at the Women's Correctional Center,

14  to let her go to the hospital, whether she told them about

15  other symptoms that she was having.  There was no

16  cross-examination on those points.

17          MR. DAY:  Your Honor, she's testified to that.  I'm

18  sure the medical providers are going to testify to the

19  opposite.  That's all going to be in front of the jury.

04:19 20          THE COURT:  That is my ruling.  I have thought about

21  this very hard.

22          MR. GODLESKI:  I hear that, your Honor.  I guess I

23  just want to mention one thing I'm really struggling with.  I

24  just simply don't understand the difference between

25  cross-examining a witness about a conversation that they had as

1    opposed to cross-examining them about a phone call that they

2    had right after the conversation and then implying because they

3    didn't mention --

4        THE COURT:  I think I said that I thought Mr. Giordano

5    came closer than anybody else, but the majority of the

6    omission, so to speak, in the notes have to do with the medical

7    care providers who are employed by the Hampden County Sheriff's

8    Department.  That's where Ms. Lech has clearly testified that

9    she asked to go to the hospital, that she told them about

04:20  10   cramping, that she told them about bulging.  She told them that

11   she asked repeatedly to be taken to the hospital.

12       Again, there's nothing in those notes.  The notes are

13   silent on that point.  In that circumstance, given that that's

14   the purpose to fill that gap, that's the purpose for which the

15   plaintiff is tendering Mr. Zygmont's evidence, and there was no

16   cross-examination on those gaps in the medical notes, that's

17   why, Mr. Godleski.

18       MR. GODLESKI:  All right.  I hear you.  I'm not going

19   to argue about the prior consistent statement.  Mr. Zygmont --

04:21  20       THE COURT:  If he observes, whatever he observes about

21   her state of mind, as long as he's sort of counselled in

22   advance, he visited her.  If her voice was -- I don't want to

23   use the word.  She would talk very fast.  She appeared anxious.

24       MR. GODLESKI:  The signals he observed.

25       THE COURT:  What he observed and saw, not what he

1    would have gleaned from what she told him about her medical

2    condition, but what he observed as to her state of mind.

3         MR. GODLESKI:  He wouldn't be allowed to testify to a

4    present sense impression.

5         THE COURT:  No.  I can give you an example of a

6    present sense impression.

7         MR. GODLESKI:  Present sense impression --

8         THE COURT:  These are an historical account of how she

9    is feeling.  An example of a present sense impression:  There's

04:22 10   a loud noise and my reaction is to say somebody just shot a

11   gun.  That's a present sense impression.  This is recollection.

12   This is her recalling that she had these conversations with the

13   care providers.  She was experiencing these conditions.  She

14   told the care providers.  They told her, go take two aspirins

15   and lie down or whatever they told her.

16        MR. GODLESKI:  I hear that.  That's what I would

17   consider the prior consistent statement.  She also says things

18   about what she's feeling right now, I can't feel the baby

19   moving, I definitely feel like something's wrong.  Those are

04:22 20   things she said to Mr. Zygmont.

21        THE COURT:  There is an exception in the hearsay rule

22   for a statement about your present medical condition, which is

23   that if it's to a care provider for purposes of treatment, it's

24   an exception to the hearsay rule.  Again, these are not

25   subjects on which Ms. Lech's credibility has been challenged on

1  cross-examination.  I don't believe it's appropriate for him to

2  testify to what she told him about her medical condition, no.

3  　　　　MR. GODLESKI:  So he can talk about what he saw and

4  what he heard in her voice.

5  　　　　THE COURT:  What he observed, if she's anxious, if she

6  presents anxious to him, if she appears to be in pain, if she

7  appears depressed, things that he would glean as his own

8  personal impressions without being told by Ms. Lech this is

9  what's going on.

04:23  10  　　　　MR. GODLESKI:  We understand.  Thank you.

11  　　　　MR. DAY:  Thank you, your Honor.

12  　　　　THE COURT:  Tomorrow you're going to complete.  How

13  long will that take?

14  　　　　MR. GIORDANO:  I would think maybe a half hour at

15  most, your Honor.

16  　　　　THE COURT:  And you're going to call Mr. Zygmont and

17  who else?  Ms. Lech's mother?

18  　　　　MR. GODLESKI:  Stefania, yes.

19  　　　　Before we get off the hearsay track, one of the things

04:24  20  that has to deal with hearsay tomorrow is the letter that

21  Ms. Lech wrote.

22  　　　　THE COURT:  It's the same.  It's offered for the same

23  purpose.  I am also going to exclude the letter.  It is

24  hearsay.  It's not a prior consistent statement offered to

25  rehabilitate credibility based on cross-examination.

```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2

 3   LIDIA LECH,                    )
                                    )
 4                  Plaintiff       )
                                    )   No. 3:17-CV-30024-KAR
 5   vs.                            )
                                    )
 6   DOROTHEA VON GOELER, et al.,   )
                                    )
 7                  Defendants.     )
                                    )
 8                                  )
                                    )
 9

10

11        BEFORE THE HONORABLE KATHERINE ROBERTSON
               UNITED STATES MAGISTRATE JUDGE
12                     JURY TRIAL
                        DAY 6
13

14

15

16              United States Courthouse
                 Hampshire Courtroom
17                 300 State Street
             Springfield, Massachusetts 01105
18

19                   May 16, 2022
                      9:00 a.m.
20

21

22            Kristin M. Kelley, RPR, CRR
                Official Court Reporter
23   John Joseph Moakley United States Courthouse
             One Courthouse Way, Room 3209
24            Boston, Massachusetts 02210
              E-mail: kmob929@gmail.com
25
         Mechanical Steno - Computer-Aided Transcript
```

Q.   More than a week later.  Okay.  So you don't know that she

would have been -- so it's very possible that if she had gone

out for a nonstress test and a biophysical profile on December

23rd it would have come back normal and she would have been

sent right back to the correctional facility?

A.   That's where I'm going to disagree.  I think more likely

than not she would have gone there and they would have found

concerning issues that would have kept her there.

Q.   In spite of the fact you just testified that you don't

03:26 know if there's placental abruption going on?

A.   Correct.

          MR. DAY:  Okay.  No further questions.

          THE COURT:  Dr. Atlas, thank you.  You will make your

flight.  Thank you.

          MR. GODLESKI:  Your Honor, we could break for the day,

whatever the Court wants to do or I could read some

depositions.

          THE COURT:  Let me see you.

                    *** Beginning of sidebar ***

03:27 THE COURT:  I want to keep the case moving but I don't

want to break the testimony up into little tiny pieces.  I'm

not going to put Ms. Lech back on the stand for a half an hour

now and have her off the stand again.  What are the parties

proposing for tomorrow?

          MR. DAY:  One thing I would subject is the motion that

```
 1    I filed this morning.

 2            THE COURT:  I am prepared to say that -- yes.  I am

 3    prepared to say that you are entitled to cross-examine her.

 4    You can complete your cross-examination.  You can ask her about

 5    specific instances of untruthfulness subject to your right to

 6    rehabilitate her on cross-examination, but the specific

 7    instances of untruthfulness reflected in the phone calls, that

 8    is admissible and, in my view, to the extent I have discretion

 9    on that issue, I will permit that evidence.  So that would take

03:27 10   probably ten minutes.

11            MR. DAY:  It's eight calls.  I'm prepared to do it

12    whenever.

13            THE COURT:  We could do that now if that would

14    complete your cross-examination of Ms. Lech.

15            MR. DAY:  It would.

16            THE COURT:  Why don't we do that.

17            MR. ROUNTREE:  The problem is I am the ride for the

18    doctor.  I am taking him to the airport.

19            THE COURT:  Mr. Godleski can stay.  He can deal with

03:28 20   it.  You can go.

21            MR. ROUNTREE:  Thank you very much.

22            THE COURT:  Why don't you go ahead and go and

23    Mr. Godleski can object.  To the extent there's an objection,

24    he can object.

25            MR. ROUNTREE:  And can I ask to be dismissed?
```

|   |   |   |   |   |
|---|---|---|---|---|
| | | Michael J. Ashe, Jr(Individually), Julie Belle-Isle, RN, Lynn Chase, Nicholas Cocchi, Natalie Cruz, Maria Diaz, Hampden County Sheriff's Department, Elizabeth Meaux, Patricia Murphy, Shantelle Rosado, Nicole Skorupski, Michael Vancini (McDonough, Michael) (Entered: 04/14/2022) | | |
| 197 | 04/14/2022 | NOTICE of Appearance by Lauren F. Olanoff on behalf of Michael J. Ashe, Jr(Individually), Julie Belle-Isle, RN, Lynn Chase, Nicholas Cocchi, Natalie Cruz, Maria Diaz, Hampden County Sheriff's Department, Elizabeth Meaux, Patricia Murphy, Shantelle Rosado, Nicole Skorupski, Michael Vancini (Olanoff, Lauren) (Entered: 04/14/2022) | View | Add to request |
| 196 | 04/13/2022 | PRETRIAL MEMORANDUM by Michael J. Ashe, Jr(Individually), Julie Belle-Isle, RN, Lynn Chase, Nicholas Cocchi, Natalie Cruz, Maria Diaz, Hampden County Sheriff's Department, Elizabeth Meaux, Patricia Murphy, Shantelle Rosado, Nicole Skorupski, Michael Vancini. (Day, Thomas) (Entered: 04/13/2022) | View | Add to request |
| 195 | 04/12/2022 | PRETRIAL MEMORANDUM by Lidia Lech. (Godleski, John) (Entered: 04/12/2022) | View | Add to request |
| 194 | 04/12/2022 | PRETRIAL MEMORANDUM by Lidia Lech. (Godleski, John) (Entered: 04/12/2022) | View | Add to request |
| 193 | 04/11/2022 | Magistrate Judge Katherine A. Robertson: ELECTRONIC ORDER entered GRANTING 162 in part and DENYING 162 in part Defendant Hampden County Sheriff's Department ("HCSD") Defendants' Motion for Summary Judgment. The HCSD Defendants seek summary judgment on Counts I, II, VI, and so much of Count V as alleges that HCSD could be found liable based on actions by Elizabeth Mieux, Natalie Cruz, and Michael Vancini. "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Wade v. Touchdown Realty Grp., LLC, 386 F. Supp. 3d 56, 62 (D. Mass. 2019) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if | Send Runner to Court | |

Add. 22

it has the potential of determining the outcome of the litigation." Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008). "[A] 'genuine' issue exists if there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citation omitted). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Count I (Deliberate Indifference to Serious Medical Need as against all HCSD Defendants): From December 23, 2013 to January 1, 2014, when Plaintiff was transported to the hospital, Plaintiff sought appropriate medical treatment for symptoms related to her high-risk pregnancy at the Western Massachusetts Regional Women's Correctional Center ("WCC") from HCSD Defendants Maria Diaz, R.N., Nurse Practitioner Nicole Skorupski, Shantelle Rosado, R.N., Julie Belle-Isle, R.N., Nursing Supervisor Lynn Chase, R.N., and Elizabeth Mieux, R.N. ("HCSD Medical Staff"). In Count I, Plaintiff alleges that the HCSD Medical Staff's deliberate indifference to her serious medical needs violated her Eighth Amendment rights. To prove an Eighth Amendment violation based on inadequate medical care, a prisoner must show that prison officials (1) failed to address a "serious medical need" and (2) were deliberately indifferent to that need. Stone v. Evangelidis, 507 F. Supp. 3d 366, 373 (D. Mass. 2020) (quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161-62 (1st Cir. 2006)). There is no dispute that Plaintiff's high-risk third-trimester pregnancy presented a serious medical need. As to Diaz, Skorupski, Rosado, Belle-Isle, and Chase, there are genuine disputes of material fact concerning the extent of the

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

symptoms Plaintiff described to those HCSD Defendants and whether or not she asked each health care provider to send her to the hospital or give her access to a doctor. See Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 499 (1st Cir. 2011) ("'[W]here "knowledge of the need for medical care [is accompanied by the]... intentional refusal to provide that care," the deliberate indifference standard has been met.'") (alterations in original) (citations omitted)). As to Mieux, who arranged for Plaintiff to be transported to the hospital on January 1, 2013, the alleged resistance to, and delay in, arranging transportation for Plaintiff in view of her medical condition and emotional distress also raises a genuine dispute of material fact as to whether Mieux might be found deliberately indifferent to Plaintiff's serious medical needs in violation of her constitutional rights. See Reaves v. Dep't of Corr., 392 F. Supp. 3d 195, 208 (D. Mass. 2019) (deliberate indifference can be demonstrated by evidence of "'denial, delay, or interference with prescribed health care'") (quoting Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011)). HCSD Defendants Natalie Cruz and Michael Vancini were working as corrections officers on the second shift at the WCC on January 1, 2014. The twenty-minute delay in transferring Plaintiff from her cell to the medical unit while she was bleeding may have been negligence on Cruz's part, but it was not deliberate indifference. See Torraco, 923 F.2d at 234 ("A finding of deliberate indifference requires more than a showing of negligence."); Page v. Sharpe, 487 F.2d 567, 569 (1st Cir. 1973) ("Mere negligence, in the absence of conduct which shocks the conscience, in giving or failing to supply medical treatment to prisoners will not suffice."). Similarly, while a factfinder could conclude that Vancini's alleged acts in the intake area were callous, there is no evidence to show

deliberate indifference by failing to provide medical care to a prisoner, even taking into account Plaintiff's allegations about her obvious emotional and physical distress. See Page, 487 F.2d at 569. To the extent Plaintiff's Second Amended Complaint alleges that Ashe and Murphy are liable on Count I under a theory of respondeat superior, Plaintiff does not press that claim. See Horan v. Cabral, 277 F. Supp. 3d 229, 234 (D. Mass. 2017). Defendants' motion for summary judgment on Count I is denied as to HCSD Defendants Diaz, Skorupski, Rosado, Belle-Isle, Chase, and Mieux, and granted as to HCSD Defendants Ashe, Murphy, Cruz, and Vancini. Count II (Supervisory Liability under 42 U.S.C. § 1983 as against Ashe, Murphy, and Chase): So much of the HCSD Defendants' motion for summary judgment on Count II as alleges supervisory liability against Ashe and Murphy for the WCC's Pregnancy Management Policy, 4.2.17, is denied for the reasons stated in the order denying the Plaintiff's motion for summary judgment on that claim. So much of the motion for summary judgment as alleges supervisory liability against Ashe and Murphy for the staffing practice at the WCC is granted for the reasons stated in the court's denial of Plaintiff's motion on that claim (ECF No. 191 ). Because Chase's involvement with the WCC's policies was limited to "suggest[ing] changes" and ensuring that the nursing staff reviewed and understood the policies (Chase Deposition, vol. I at 83), she did not "formulate[]" the Pregnancy Management policy and, consequently, is not liable as a supervisor. Williams v. Hager, Civil Action No. XXX-XX-XXXX-GAO, 2011 WL 883989, at *2 (D. Mass. Mar. 14, 2011). See Perry v. Dickhaut, 125 F. Supp. 3d 285, 299 (D. Mass. 2015) ("One way to establish supervisory liability is to demonstrate that the supervisor formulated a policy or engaged in a

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

custom that led to a constitutional violation.") (citing MaldonadoDenis v. CastilloRodriguez, 23 F.3d 576, 582 (1st Cir. 1994)). The motion for summary judgment on Count II is granted as to Chase. Count V (Negligence Against HCSD as a Public Employer): Because the parties' experts agree that Plaintiff's baby was not viable on January 1, 2014, when Plaintiff interacted with HCSD Defendants Mieux, Cruz, and Vancini, Defendants seek summary judgment as to those Defendants on the ground that Plaintiff cannot prove damages. See Jupin v. Kask, 849 N.E.2d 829, 834-35 (Mass. 2006) (to prevail on a negligence claim, plaintiff must prove that damage resulted from the defendant's negligence). However, Plaintiff claims that the purported negligence of these HCSD Defendants caused her psychological damage, and this allegation raises a genuine question of material fact. The motion for summary judgment on Count V is denied as to HCSD and the actions of Defendants Mieux, Cruz, and Vancini may be relied upon by Plaintiff as a basis for a finding of negligence by HCSD. Count VI (Intentional Infliction of Emotional Distress ["IIED"] as Against All HCSD Defendants): "'To make out a claim of intentional infliction of emotional distress, the plaintiffs were required to show (1) that [defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe. The standard for making a claim of intentional infliction of emotional distress is very high.'" Bettencourt v. Town of Mendon, 334 F. Supp. 3d 468, 487 (D. Mass. 2018) (alteration in original) (quoting Polay v. McMahon,10 N.E.3d 1122, 1128 (Mass. 2014)). "Conduct qualifies as extreme and outrageous only if it go[es] beyond all possible bounds of decency,

Add. 26

and [is] regarded as atrocious, and utterly intolerable in a civilized community." Id. (alterations in original) (quoting Polay,10 N.E.3d at 1128). Ashe's and Murphy's conduct in formulating the Pregnancy Management Policy does not meet the IIED standard as a matter of law because there is no evidence that Ashe and Murphy knew or should have known that the policy would harm Plaintiff. See Henriquez v. City of Lawrence, Civil Action No. 14-cv-14710-IT, 2015 WL XXX-XX-XXXX, at *5 (D. Mass. June 25, 2015) (dismissing IIED claim where there were no allegations that defendant targeted plaintiff); Rua v. Glodis, 52 F. Supp. 3d 84, 100 (D. Mass. 2014) (same). Because the bar for IIED liability may be as high as the standard for a finding of deliberate indifference, see Rua, 52 F. Supp. 3d at 100, and the court has found that Plaintiff has not shown that Cruz was deliberately indifferent to Plaintiff's serious medical needs, Plaintiff has not shown that the delay she attributes to Cruz rises to the level of IIED. However, whether the HCSD Medical Staff's alleged failure to provide Plaintiff with timely access to essential medical care and Vancini's alleged callous conduct meet the IIED standard raise genuine issues of material fact. Therefore, summary judgment on Count VI is granted as to Ashe, Murphy, and Cruz, and denied as to Diaz, Skorupski, Rosado, Belle-Isle, Chase, Mieux, and Vancini. (Rivera, Melissa) (Entered: 04/11/2022)

| | | | |
|---|---|---|---|
| 192 | 04/05/2022 | Magistrate Judge Katherine A. Robertson: ELECTRONIC ORDER entered DENYING 165 Defendant Dorothea Von Goeler, M.D.'s, Motion for Partial Summary Judgment. Dr. Von Goeler seeks an order for summary judgment on Count I, alleging that she acted with deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment, and on Count VI, alleging intentional infliction of emotional distress ("IIED"). | Send Runner to Court |

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VI. Witnesses

Federal Rules of Evidence Rule 608, 28 U.S.C.A.

Rule 608. A Witness's Character for Truthfulness or Untruthfulness

Currentness

**(a) Reputation or Opinion Evidence.** A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

**(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

  **(1)** the witness; or

  **(2)** another witness whose character the witness being cross-examined has testified about.

By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

  **CREDIT(S)**
  (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1935; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Mar. 27, 2003, eff. Dec. 1, 2003; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 608, 28 U.S.C.A., FRE Rule 608
Including Amendments Received Through 6-1-23

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
      Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 801, 28 U.S.C.A.

Rule 801. Definitions That Apply to This Article; Exclusions From Hearsay

Currentness

**(a) Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

**(b) Declarant.** "Declarant" means the person who made the statement.

**(c) Hearsay.** "Hearsay" means a statement that:

  **(1)** the declarant does not make while testifying at the current trial or hearing; and

  **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

**(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

  **(1) A Declarant-Witness's Prior Statement.** The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

    **(A)** is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

    **(B)** is consistent with the declarant's testimony and is offered:

      **(i)** to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

      **(ii)** to rehabilitate the declarant's credibility as a witness when attacked on another ground; or

    **(C)** identifies a person as someone the declarant perceived earlier.

  **(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1938; Pub.L. 94-113, § 1, Oct. 16, 1975, 89 Stat. 576; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 25, 2014, eff. Dec. 1, 2014.)

Fed. Rules Evid. Rule 801, 28 U.S.C.A., FRE Rule 801
Including Amendments Received Through 6-1-23

---

**End of Document**                                                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
     Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 803, 28 U.S.C.A.

Rule 803. Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness

Currentness

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

**(1) Present Sense Impression.** A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.

**(2) Excited Utterance.** A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.

**(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

**(4) Statement Made for Medical Diagnosis or Treatment.** A statement that:

   **(A)** is made for--and is reasonably pertinent to--medical diagnosis or treatment; and

   **(B)** describes medical history; past or present symptoms or sensations; their inception; or their general cause.

**(5) Recorded Recollection.** A record that:

   **(A)** is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;

   **(B)** was made or adopted by the witness when the matter was fresh in the witness's memory; and

   **(C)** accurately reflects the witness's knowledge.

If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

**(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:

**(A)** the record was made at or near the time by--or from information transmitted by--someone with knowledge;

**(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

**(C)** making the record was a regular practice of that activity;

**(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

**(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

**(7) Absence of a Record of a Regularly Conducted Activity.** Evidence that a matter is not included in a record described in paragraph (6) if:

**(A)** the evidence is admitted to prove that the matter did not occur or exist;

**(B)** a record was regularly kept for a matter of that kind; and

**(C)** the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness.

**(8) Public Records.** A record or statement of a public office if:

**(A)** it sets out:

**(i)** the office's activities;

**(ii)** a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

**(iii)** in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

**(B)** the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

**(9) Public Records of Vital Statistics.** A record of a birth, death, or marriage, if reported to a public office in accordance with a legal duty.

**(10) Absence of a Public Record.** Testimony--or a certification under Rule 902--that a diligent search failed to disclose a public record or statement if:

    **(A)** the testimony or certification is admitted to prove that

        **(i)** the record or statement does not exist; or

        **(ii)** a matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind; and

    **(B)** in a criminal case, a prosecutor who intends to offer a certification provides written notice of that intent at least 14 days before trial, and the defendant does not object in writing within 7 days of receiving the notice--unless the court sets a different time for the notice or the objection.

**(11) Records of Religious Organizations Concerning Personal or Family History.** A statement of birth, legitimacy, ancestry, marriage, divorce, death, relationship by blood or marriage, or similar facts of personal or family history, contained in a regularly kept record of a religious organization.

**(12) Certificates of Marriage, Baptism, and Similar Ceremonies.** A statement of fact contained in a certificate:

    **(A)** made by a person who is authorized by a religious organization or by law to perform the act certified;

    **(B)** attesting that the person performed a marriage or similar ceremony or administered a sacrament; and

    **(C)** purporting to have been issued at the time of the act or within a reasonable time after it.

**(13) Family Records.** A statement of fact about personal or family history contained in a family record, such as a Bible, genealogy, chart, engraving on a ring, inscription on a portrait, or engraving on an urn or burial marker.

**(14) Records of Documents That Affect an Interest in Property.** The record of a document that purports to establish or affect an interest in property if:

    **(A)** the record is admitted to prove the content of the original recorded document, along with its signing and its delivery by each person who purports to have signed it;

**(B)** the record is kept in a public office; and

**(C)** a statute authorizes recording documents of that kind in that office.

**(15) Statements in Documents That Affect an Interest in Property.** A statement contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose--unless later dealings with the property are inconsistent with the truth of the statement or the purport of the document.

**(16) Statements in Ancient Documents.** A statement in a document that was prepared before January 1, 1998, and whose authenticity is established.

**(17) Market Reports and Similar Commercial Publications.** Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations.

**(18) Statements in Learned Treatises, Periodicals, or Pamphlets.** A statement contained in a treatise, periodical, or pamphlet if:

**(A)** the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and

**(B)** the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

If admitted, the statement may be read into evidence but not received as an exhibit.

**(19) Reputation Concerning Personal or Family History.** A reputation among a person's family by blood, adoption, or marriage--or among a person's associates or in the community--concerning the person's birth, adoption, legitimacy, ancestry, marriage, divorce, death, relationship by blood, adoption, or marriage, or similar facts of personal or family history.

**(20) Reputation Concerning Boundaries or General History.** A reputation in a community--arising before the controversy--concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation.

**(21) Reputation Concerning Character.** A reputation among a person's associates or in the community concerning the person's character.

**(22) Judgment of a Previous Conviction.** Evidence of a final judgment of conviction if:

**(A)** the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

Add. 34

**(B)** the conviction was for a crime punishable by death or by imprisonment for more than a year;

**(C)** the evidence is admitted to prove any fact essential to the judgment; and

**(D)** when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.

The pendency of an appeal may be shown but does not affect admissibility.

**(23) Judgments Involving Personal, Family, or General History, or a Boundary.** A judgment that is admitted to prove a matter of personal, family, or general history, or boundaries, if the matter:

**(A)** was essential to the judgment; and

**(B)** could be proved by evidence of reputation.

**(24) [Other Exceptions.]** [Transferred to Rule 807.]

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1939; Pub.L. 94-149, § 1(11), Dec. 12, 1975, 89 Stat. 805; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 13, 2013, eff. Dec. 1, 2013; Apr. 25, 2014, eff. Dec. 1, 2014; Apr. 27, 2017, eff. Dec. 1, 2017.)

Fed. Rules Evid. Rule 803, 28 U.S.C.A., FRE Rule 803
Including Amendments Received Through 6-1-23

Add. 35

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 806, 28 U.S.C.A.

Rule 806. Attacking and Supporting the Declarant's Credibility

Currentness

When a hearsay statement--or a statement described in Rule 801(d)(2)(C), (D), or (E)--has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1943; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 806, 28 U.S.C.A., FRE Rule 806
Including Amendments Received Through 6-1-23

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Add. 36

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) in that, according to the word-count feature of the word-processing system used to prepare this document (Microsoft Word for Office 365), the brief contains 12,983 words, excluding the portions exempted by Rule 32(f).

/s/ *Daniel S. Volchok*
DANIEL S. VOLCHOK

# CERTIFICATE OF SERVICE

On this 16th day of June, 2023, I electronically filed the foregoing using the Court's appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ *Daniel S. Volchok*
DANIEL S. VOLCHOK