No. 22-1507

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

LIDIA LECH,

*Plaintiff-Appellant,*

*v.*

DOROTHEA VON GOELER, BAYSTATE MEDICAL PRACTICES, INC., HAMPDEN COUNTY SHERIFF'S DEPARTMENT, MARIA DIAZ, NICOLE SKORUPSKI, ELIZABETH MEAUX, SHANTELLE ROSADO, JULIE BELLE-ISLE, LYNN CHASE, MICHAEL J. ASHE, JR. PATRICIA MURPHY, NICHOLAS COCCHI, NATALIE CRUZ, AND MICHAEL VANCINI,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

**BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION
OF MASSACHUSETTS AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFF-APPELLANT AND URGING REVERSAL**

_____

Jessie J. Rossman (1st Cir. No. 1208361)
Medha Swaminathan (1st Cir. No. 1208361)
Kirsten Mayer (1st Cir. No. 71971)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
mswaminathan@aclum.org
kmayer@aclum.org

JUNE 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* the American Civil Liberties Union of Massachusetts certifies that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

**Corporate Disclosure Statement** ........................................................ i

**Table of Contents** ........................................................................... ii

**Table of Authorities** ...................................................................... iii

**Interests of *Amicus Curiae*** ......................................................... viii

**Introduction** ................................................................................ 1

**Background** .................................................................................. 3

  I.  Opioid Use Disorder (OUD) Is a Disease Whose Recommended Treatment Is Medication for Opioid Use Disorder ........................... 3

  II.  Stigma Against People with Substance Use Disorders (SUDs) Results in Implicit Bias and Perpetuates Negative Stereotypes, Including That People with SUDs Are Not Credible .............................................. 8

  III.  The Language Used to Describe People with OUD and other SUDs Significantly Affects How Others Perceive Them. ......................... 13

**Argument** ................................................................................... 15

  I.  Stigma Regarding Ms. Lech's SUDs Pervaded Her Trial. .............. 15

  II.  Ms. Lech's Inability to Present Evidence Corroborating Her Testimony Harmed Her Substantial Rights at Trial, Particularly Given Social Attitudes Towards the Credibility of People with SUD. ............... 17

  A.  Ms. Lech's Credibility Was Impeached at Trial and the Excluded Evidence Should Have Been Admitted to Rehabilitate Her. ........... 17

    1.  The Amended Rule 801(d)(1)(B) Admits Prior Consistent Statements in Numerous Circumstances Where a Witness's Credibility Has Been Attacked ........................................ 18

    2.  Defense Counsel Attacked Ms. Lech's Credibility as a Witness and the Excluded Evidence was Rehabilitative. ................... 20

  B.  The Trial Court's Improper Exclusion Affected Ms. Lech's Substantial Rights, Particularly Because as a Pregnant Person With SUDs Who Was Taking MOUD, She Was Acutely Vulnerable to Attacks on Her Credibility. ........................................................ 22

**Conclusion** ................................................................................. 25

**Certificate of Compliance** ............................................................ 27

**Certificate of Service** .................................................................. 27

## TABLE OF AUTHORITIES

### Cases

*Boatner v. Berryhill*,
　2018 WL 2191804 (S.D. Miss. May 11, 2018) .................................................23

*Chicago & N.W. Ry. Co. v. McKenna*,
　74 F.2d 155 (8th Cir. 1934) ................................................................................24

*Cox v. Bos. Police Dep't*,
　No. 22-11009 (D. Mass.) ................................................................................. viii

*Effinger v. Effinger*,
　239 P. 801 (Nev. 1925) .......................................................................................24

*Espeaignnette v. Gene Tierney Co.*,
　43 F.3d 1 (1st Cir. 1994).....................................................................................22

*Geddes v. City of Boston*,
　SJ-2021-408 (Mass. 2021) ............................................................................... viii

*Godfrey v. United States*,
　353 F.2d 456 (D.C. Cir. 1965)............................................................................25

*Gomez v. Rivera Rodriguez*,
　344 F.3d 103 (1st Cir. 2003)...............................................................................21

*Gray v. Cummings*,
　917 F.3d 1 (1st Cir. 2019).................................................................................. viii

*Jenkins v. State*,
　729 N.E.2d 147 (Ind. 2000) ...............................................................................23

*O'Neill v. City of Springfield*,
　No. 20-30036 (D. Mass.) .................................................................................. viii

*Pesce v. Coppinger*,
　355 F. Supp. 3d 35 (D. Mass. 2018) ........................................................... viii, 4

*Sclafani v. Mici*,
　No. 19-12550 (D. Mass.) .................................................................................. viii

*Smith v. Aroostook Cnty.*,
　922 F.3d 41 (1st Cir. 2019).................................................................................. 4

*Stahl v. Haynes*,
　2020 WL 5632510 (W.D. Wash. Sept. 21, 2020)...............................................23

*State v. Fong*,
 158 P. 233 (Idaho 1916) ....................................................24

*United States v. Baez-Acuna*,
 125 F.3d 863 (10th Cir. 1997) ..........................................25

*United States v. Carroll*,
 53 F. App'x 785 (7th Cir. 2002) .......................................23

*United States v. Flores*,
 945 F.3d 687 (2d Cir. 2019) .............................................19

*United States v. Mitchell*,
 2018 WL 6729792 (E.D. Va. Dec. 21, 2018) ...................19

*United States v. Mojica*,
 185 F.3d 780 (7th Cir. 1999) ...........................................23

*United States v. Purcell*,
 967 F.3d 159 (2d Cir. 2020) .............................................19

*United States v. Ray*,
 2022 WL 813942 (S.D.N.Y. Mar. 16, 2022) ....................19

*United States v. Sepulveda*,
 15 F.3d 1161 (1st Cir. 1993) ............................................22

*Walker v. Marsh*,
 2022 WL 3598061 (E.D. Pa. Aug. 22, 2022) ....................25

## Rules and Regulations

Fed. R. Civ. P. 61 ....................................................................22

Fed. R. Evid. 801(d)(1)(B) .............................................*passim*

Fed. R. Evid. 801(d)(1)(B)(i) .................................................18

Fed. R. Evid. 801(d)(1)(B)(ii) ................................................18

## Other Authorities

*A Collaborative Approach to the Treatment of Pregnant Women with Opioid Use Disorders*, SAMHSA (2016). .......................................8, 14

*Addressing Stigma*, U.S. Dep't Labor (last accessed on June 17, 2023)................12

Alexander Lekhtman, *SAMHSA Eyes Budget Boost – And Cutting "Abuse" From Its Name*, Filter (Mar. 15, 2023) .........................................4

Alexander M. Dydyk et al., *Opioid Use Disorder*, Nat'l Libr. Med. (last updated June 21, 2022)...........................................................................................4

Andrea Weber et al., *Substance Use in Pregnancy: Identifying Stigma and Improving Care*, 13 Substance Abuse & Rehabilitation 105 (2021)....................9

Carrie Wilens & Jeffrey Foote, *"Bad Parents," "Codependents," and Other Stigmatizing Myths About Substance Use Disorder in the Family, in* The Stigma of Addiction 33 (Jonathan D. Avery & Joseph J. Avery eds., 2019). .................12

Colleen L. Barry et al., *Stigma, Discrimination, Treatment Effectiveness, and Policy: Public Views About Drug Addiction and Mental Illness*, 65 Psychiatric Svs. 1269 (2014). ...................................................................................9

Davida M. Schiff et al., *Assessing Stigma Towards Substance Use in Pregnancy: A Randomized Study Testing the Impact of Stigmatizing Language and Type of Opioid Use on Attitudes Toward Mothers with Opioid Use Disorder*, 16 J. Addiction Medicine 1 (2022)...................................................................9

*Definition of Addiction*, Am. Soc'y Addiction Med. (Sept. 5, 2019).........................8

Deirdre M. Smith, *The Disordered and Discredited Plaintiff: Psychiatric Evidence in Civil Litigation*, 31 Cardozo L. Rev. 749 (2010)...........................................10

Dr. Nora D. Volkow (NIDA), What Science Tells Us About Opioid Abuse and Addiction, Testimony Before the Senate Judiciary Committee (Jan. 27, 2016). ..6

*Effective Treatments for Opioid Addiction*, Nat'l Inst. Drug Abuse (NIDA) (last updated Nov. 2016)...............................................................................5

Jan Abel Olsen et al., *The Moral Relevance of Personal Characteristics in Setting Health Care Priorities*, 57 Soc. Sci. Med. 1163 (2003). ......................................9

Janet Zwick et al., *Stigma: How it Affects the Substance Use Disorder Patient*, 15 Substance Abuse Treatment, Prevention & Pol'y 1 (2020)...............................14

Jennifer J. Carroll et al., *The Harms of Punishing Substance Use During Pregnancy*, 98 Int'l J. of Drug Pol'y 1 (2021). ......................................................9

John F. Kelly & Cassandra M. Westerhoff, *Does It Matter How We Refer to Individuals with Substance-Related Conditions? A Randomized Study of Two Commonly Used Terms*, 21 Int'l J. Drug Pol'y 202 (2009). ..........................13, 14

Julia Woo et al*., "Don't Judge a Book by Its Cover": A Qualitative Study of Methadone Patients' Experiences of Stigma*, 2017 Substance Abuse: Research & Treatment. ..................................................................................9

Karen Werder et al., *Addressing Bias and Stigma in the Language We Use with Persons with Opioid Use Disorder: A Narrative Review*, 28 J. Am. Psych. Nurses Ass'n 9 (2022). ........................................................................13

Katherine M. Cole, *She's Crazy (to Think We'll Believe Her): Credibility Discounting of Women with Mental Illness in the Era of #MeToo*, 22 Geo. J. Gender & L. 173 (2020). ..................................................................10

Kevin M. Cremin et al., *Ensuring A Fair Hearing for Litigants with Mental Illnesses: The Law and Psychology of Capacity, Admissibility, and Credibility Assessments in Civil Proceedings*, 17 J. L. & Pol'y 455 (2009). ........................11

Lindsay A. Phillips & Autherine Shaw, *Substance Use More Stigmatized Than Smoking and Obesity*, 18 J. Subst. Use 247 (2013). ..............................................9

*Medications for Opioid Use Disorder: For Healthcare and Addiction Professionals, Policymakers, Patients, and Families*, SAMHSA (last updated 2021) ..........................................................................4

*National Drug Control Strategy*, Off. Nat'l Drug Control Pol'y (Apr. 2022). ..........6

Nguyen Thu Trang et al., *How to Be Self-Reliant in a Stigmatising Context? Challenges Facing People Who Inject Drugs in Vietnam*, 87 Int'l J. Drug Pol'y 1 (2021). ...............................................................................12

*Opioid Use and Opioid Use Disorder in Pregnancy (Committee Opinion 711)*, Am. Coll. Obstetricians & Gynecologists (Aug. 2017). ..............................................7

*Opioid Use Disorder and Pregnancy*, Am. Coll. Obstetricians & Gynecologists,Opioid Use Disorder and Pregnancy, Am. Coll. Obstetricians & Gynecologists (last reviewed June 2022). ..........................................................8

*Opioid Use Disorder and Pregnancy*, SAMHSA (last accessed on June 17, 2023). 7

*Opioid Use Disorder Is a Treatable Chronic Brain Disease, in* Medications for Opioid Use Disorder Save Lives 15 (Alan I. Leshner & Michelle Mancher, eds., 2019). ..............................................................................5

Press Release, U.S. Food and Drug Administration, FDA Takes New Steps to Encourage the Development of Novel Medicines for the Treatment of Opioid Use Disorder (Aug. 6, 2018).................................................................6

Richard Balon, *Complexity of Reducing the Stigma of Mental Illness*, 47 Academic Psychiatry 95 (2023). ..........................................................................12

Robert D. Ashford et al., *"Abusing Addiction": Our Language Still Isn't Good Enough*, 37 Alcohol Treatment Q. 1 (2020). .............................................15

Sarah J. Newman, *Prevention, Not Prejudice: The Role of Federal Guidelines in HIV-Criminalization Reform*, 107 Nw. U. L. Rev. 1403 (2013). ........................11

Sarah R. Christie, *AIDS, Employment, and the Direct Threat Defense: The Burden of Proof and the Circuit Court Split*, 76 Fordham L. Rev. 235 (2007). .............11

*The Americans with Disabilities Act and the Opioid Crisis: Combating Discrimination Against People in Treatment or Recovery*, U.S. Dep't Just. (Apr. 5, 2022). ....................................................................................................................4

*Understanding Alcohol Use Disorder,* Nat'l Inst. of Health (last updated Apr. 2023). ...................................................................................................................5

Valerie Earnshaw, *Drug Addiction Stigma in the Context of Methadone Maintenance Therapy: An Investigation into Understudied Sources of Stigma*, 11 Int'l J. Mental Health & Addiction 110 (2013). ..................................................13

Wilens & Foote, *supra* note 38 at 40 (quoting Theresa B. Moyer & William R. Miller, *Therapists' Conceptualizations of Alcoholism*, 41 Psych. Addictive Behaviors 238 (1993)...........................................................................................13

*Your Words Matter – Language Showing Compassion and Care for Women, Infants, Families, and Communities Impacted by Substance Use Disorder*, NIDA (July 25, 2022). ........................................................................................8, 13, 14

## INTERESTS OF *AMICUS CURIAE*

The American Civil Liberties Union of Massachusetts, Inc. (ACLUM) is a statewide nonprofit membership organization dedicated to the principles of liberty and equality embodied in the constitutions and laws of the Commonwealth and the United States. ACLUM has frequently appeared before this and other courts in support of constitutional and other protected rights, including the rights of people with disabilities, such as substance use disorders. *See, e.g.*, *Gray v. Cummings*, 917 F.3d 1 (1st Cir. 2019); *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018); *Cox v. Bos. Police Dep't*, No. 22-11009 (D. Mass.); *O'Neill v. City of Springfield*, No. 20-30036 (D. Mass.); *Sclafani v. Mici*, No. 19-12550 (D. Mass.); *Geddes v. City of Boston*, SJ-2021-408 (Mass. 2021). This case implicates ACLUM's mission and values because it concerns the rights of a person with a disability to be free from discrimination and cruel and unusual punishment under the United States Constitution.[1]

---

[1] ACLUM has concurrently filed a motion for leave to file this brief as *amicus curiae*. Fed. R. App. P. 29(a)(4)(D). In accordance with Fed. R. App. P. 29(a)(4)(E), *amicus curiae* certifies that (1) this brief was authored entirely by counsel for *amicus curiae* and not counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money to preparing or submitting this brief; and (3) no person other than *amicus curiae* contributed money to the preparation or submission of this brief.

## INTRODUCTION

All people, regardless of their identity or experiences, must have the same opportunity to vindicate their rights in court. Given the pervasive negative stigma against people with opioid use disorder (OUD), alcohol use disorder (AUD) and other substance use disorders (SUDs), this is more challenging for people who, like Lidia Lech, live with these disabilities. The trial court's erroneous rulings substantially increased this hurdle. Defendants' theory of the case suffused the trial with negative stigma regarding Ms. Lech's substance use, deploying inflammatory language and fanning latent misconceptions that people with substance use disorder are not credible. Within the context of these attacks, the trial court's refusal to allow Ms. Lech to provide third-party testimony supporting her claims substantially damaged her ability to present her case before the jury. This Court cannot entirely remove such stigma from jurors' minds. But it can ensure that the proper evidentiary rulings give Ms. Lech the chance to prove her claims before a jury who will be able to decide the case on the merits, rather than on the basis of bias.

*Amicus curiae* the American Civil Liberties Union of Massachusetts (ACLUM) submits this brief to underscore the impact and harm of the exclusion of Ms. Lech's proffered rehabilitation evidence because of her status as a pregnant

person with substance use disorder.[2] The trial court denied Ms. Lech's motion to admit the testimony of Ms. Lech's close friend, Mr. Alfred Zygmont, as rehabilitation evidence pursuant to Federal Rule of Evidence 801(d)(1)(B). Throughout the trial, defendants asserted that Ms. Lech had a character for untruthfulness and that her testimony that the Women's Correctional Center (WCC) medical staff ignored her requests for treatment was false. In support of this assertion, defendants presented phone calls between Ms. Lech and her family members to argue that because she did not mention her complaints in those calls, her claim that she had in fact complained to WCC staff was not credible. *See, e.g.*, Joint Appendix (JA) at 298 ("Her calls contradict the story Lidia Lech is trying to tell you through this lawsuit.").

Ms. Lech sought to admit Mr. Zygmont's testimony to rebut this assertion, as he was expected to testify that Ms. Lech relayed her concerns about her physical symptoms and the inattention of the WCC medical staff to him during his in-person visits with her at the WCC. JA146-48. Despite the clear language of Rule 801(d)(1)(B) and the defendants' clear tactics to impeach Ms. Lech, the trial court denied Ms. Lech's motion, reasoning that there had not been "any real challenge to her credibility with respect to what she said on the phone calls." JA700. In so doing,

---

[2] ACLUM also supports Ms. Lech's arguments that summary judgment was improvidently granted to defendant Natalie Cruz. *See* Pl-Appellant's Br. at 33-48, 55-56.

the trial court construed the impeachment requirement of Rule 801(d)(1)(B) far too narrowly.

This was an error, and a harmful one. OUD is not a moral failing: it is a disease and a recognized disability. The same is true of other SUDs. Nevertheless, scientific literature demonstrates that the credibility scale is already tipped against a witness with an SUD. As a result, the erroneous exclusion of rehabilitation evidence had an outsized impact on Ms. Lech as compared to a witness without a substance use disorder. The jury had improper preconceived notions about Ms. Lech's credibility due to her OUD and AUD that were then consistently reinforced by the language used at trial. Under these circumstances, the lack of rehabilitation evidence was particularly detrimental.

For the reasons stated in Ms. Lech's filings and in this brief, this Court should reverse the judgment below and remand for further proceedings.

## BACKGROUND

### I.    Opioid Use Disorder Is a Disease Whose Recommended Treatment Is Medication for Opioid Use Disorder.

There is widespread scientific recognition that OUD is a disease.[3] Specifically, OUD is a chronic disease that alters the chemistry of the brain, creating

---

[3] *Opioid Use Disorder*, Am. Psychiatric Ass'n, https://www.psychiatry.org/patients-families/opioid-use-disorder (last reviewed Dec. 2022).

"an overpowering desire to use opioids, increased opioid tolerance, and (the experience of) withdrawal syndrome when discontinued."[4] The Substance Abuse and Mental Health Services Administration (SAMHSA)[5] estimates that as of 2019, more than 1.6 million people in the United States had OUD.[6] Opioid addiction often begins when a person's doctor prescribes opioid painkillers as medication, which have a higher risk of quickly causing addiction than other substances.[7] Reflecting this scientific understanding, courts and the federal government recognize that the involuntary and debilitating nature of OUD renders it a qualifying disability under federal antidiscrimination law. *See, e.g.*, *Smith v. Aroostook Cnty.*, 922 F.3d 41, 42 (1st Cir. 2019); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 45 (D. Mass. 2018).[8]

---

[4] Alexander M. Dydyk et al., *Opioid Use Disorder*, Nat'l Libr. Med., https://www.ncbi.nlm.nih.gov/books/NBK553166/ (last updated June 21, 2022).

[5] SAMHSA's latest budget request for FY 2024 asked Congress to remove "abuse" from its name to become the "Substance Use and Mental Health Services Administrations." *See* Alexander Lekhtman, *SAMHSA Eyes Budget Boost – And Cutting "Abuse" From Its Name*, Filter (Mar. 15, 2023), https://filtermag.org/samhsa-abuse-budget/.

[6] *Medications for Opioid Use Disorder: For Healthcare and Addiction Professionals, Policymakers, Patients, and Families*, SAMHSA, ES-2, https://www.ncbi.nlm.nih.gov/books/NBK574917/ (last updated 2021).

[7] *Id.*

[8] *See The Americans with Disabilities Act and the Opioid Crisis: Combating Discrimination Against People in Treatment or Recovery*, U.S. Dep't Just. 2 (Apr. 5, 2022), https://archive.ada.gov/opioid_guidance.pdf. ("[T]he Americans with Disabilities Act . . . prohibits discrimination against people in recovery from opioid use disorder . . . ."). Alcohol use disorder (AUD) is another chronic disease in which "[l]asting changes in the brain caused by alcohol misuse perpetuate AUD and make individuals vulnerable to relapse." *Understanding Alcohol Use Disorder,*

The standard of care for people with OUD is the provision of medication for opioid use disorder (MOUD). Food and Drug Administration (FDA)-approved medications buprenorphine and methadone—which have been deemed "essential medicines" by the World Health Organization[9]—activate opioid receptors in the brain to relieve withdrawal symptoms and control cravings without producing euphoria.[10] Embracing the medical consensus, numerous federal entities have expressly endorsed the necessity of MOUD, including: the Department of Health

---

Nat'l Inst. of Health, https://www.niaaa.nih.gov/publications/brochures-and-fact-sheets/understanding-alcohol-use-disorder (last updated Apr. 2023).

[9] *See Effective Treatments for Opioid Addiction*, Nat'l Inst. Drug Abuse (NIDA), https://nida.nih.gov/publications/effective-treatments-opioid-addiction (last updated Nov. 2016).

[10] *Opioid Use Disorder Is a Treatable Chronic Brain Disease, in* Medications for Opioid Use Disorder Save Lives 15, 19 (Alan I. Leshner & Michelle Mancher, eds., 2019).

and Human Services (HHS),[11] the FDA,[12] the National Institute on Drug Abuse (NIDA),[13] the Office of National Drug Control Policy,[14] and SAMHSA.[15]

---

[11] *See, e.g.*, Press Release, U.S. Food and Drug Administration, FDA Takes New Steps to Encourage the Development of Novel Medicines for the Treatment of Opioid Use Disorder (Aug. 6, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm615892.htm (HHS Secretary Alex Azar explaining that "[t]he evidence is clear: medication-assisted treatment works, and it is a key piece of defeating the drug crisis facing our country") (internal quotation marks omitted).

[12] *See, e.g.*, *id.* (former FDA Commissioner Dr. Scott Gottlieb underscoring, "We're committed to doing our part to expand access to high-quality, effective medication-assisted treatments and encouraging health care professionals to ensure patients with opioid use disorder are offered an adequate chance to benefit from these therapies. This work also includes improving understanding about the treatment options available for patients and countering the unfortunate stigma that's sometimes associated with their use") (internal quotation marks omitted).

[13] *See, e.g.*, Dr. Nora D. Volkow (NIDA), What Science Tells Us About Opioid Abuse and Addiction, Testimony Before the Senate Judiciary Committee (Jan. 27, 2016) ("Medications have become an essential component of an ongoing treatment plan, enabling opioid-addicted persons to regain control of their health and their lives . . . To be clear, the evidence supports long-term maintenance with these medicines in the context of behavioral treatment and recovery support, not short-term detoxification programs aimed at abstinence."). The White House has requested that NIDA remove "abuse" from its name to become the National Institute on Drugs and Addiction. *See National Drug Control Strategy*, Off. Nat'l Drug Control Pol'y 3 n.1 (Apr. 2022), https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf [hereinafter "*National Drug Control Strategy*"].

[14] *See, e.g.*, *National Drug Control Strategy* at 49 ("Wherever possible, inexpensive oral methadone and sublingual buprenorphine should be the backbone of our treatment system for caring for people with opioid use disorder . . . .")

[15] *See, e.g.*, SAMHSA, *supra* note 6 at 1-3 ("Ongoing . . . medication treatment for OUD is linked to better retention and outcomes than treatment without medication," and certain MAT medications, including buprenorphine, were "found to be more effective in reducing illicit opioid use than no medication" and "have also been associated with reduced risk of overdose death.").

Methadone has been the standard treatment for pregnant people with OUD since the 1970s,[16] and is endorsed as the recommended protocol by numerous experts including both the American College of Obstetricians and Gynecologists (ACOG)[17] and SAMHSA.[18] Years of research have consistently demonstrated that MOUD does not cause birth defects,[19] but the misunderstandings in the general public remain regarding neonatal abstinence syndrome (NAS). NAS can occur when a fetus is exposed to opioids in utero—including MOUD—leading to a physical dependence that may trigger withdrawal symptoms after delivery.[20] As SAMHSA emphasizes, however, the potential for NAS should not deter healthcare providers from prescribing MOUD.[21] That makes sense given that MOUD is "the best treatment for opioid use disorder during pregnancy," and NAS is treatable, usually lasts only a

---

[16] *Opioid Use and Opioid Use Disorder in Pregnancy (Committee Opinion 711)*, Am. Coll. Obstetricians & Gynecologists (Aug. 2017), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2017/08/opioid-use-and-opioid-use-disorder-in-pregnancy [hereinafter ACOG Opinion 711].

[17] *Id.*

[18] *Opioid Use Disorder and Pregnancy*, SAMHSA, https://store.samhsa.gov/sites/default/files/d7/priv/sma18-5071fs1.pdf (last accessed on June 17, 2023) ("For pregnant women, OUD is best treated with the medicines called methadone or buprenorphine along with counseling and recovery support services.").

[19] ACOG Opinion 711, *supra* note 16.

[20] *Id*.

[21] *Supra* note 18.

few days or weeks, and causes no known lasting physical or intellectual problems.[22]

Critically, referring to newborns with NAS as "addicted" rather than physically

dependent is "inaccurate [and] incorrect,"[23] because addiction is a behavioral

disorder that newborns are incapable of exhibiting.[24]

## II. Stigma Against People with SUDs Results in Implicit Bias and Perpetuates Negative Stereotypes, Including That People with SUDs Are Not Credible.

Research demonstrates that the public holds significant negative perceptions

against people—particularly pregnant people—with SUDs and who take MOUD.

This is true even as compared to other stigmatized populations: the American public

---

[22] *Opioid Use Disorder and Pregnancy*, Am. Coll. Obstetricians & Gynecologists, https://www.acog.org/womens-health/faqs/opioid-use-disorder-and-pregnancy (last reviewed June 2022).

[23] *A Collaborative Approach to the Treatment of Pregnant Women with Opioid Use Disorders*, SAMHSA 5 (2016), https://store.samhsa.gov/sites/default/files/d7/priv/sma16-4978.pdf (quoting *Open Letter Regarding Alarmist and Inaccurate Reporting on Prescription Opiate Use by Pregnant Women*, Int'l Drug Pol'y Consortium (Mar. 20, 2013), https://idpc.net/news/2013/03/open-letter-regarding-alarmist-and-inaccurate-reporting-on-prescription-opiate-use-by-pregnant-women).

[24] *Definition of Addiction*, Am. Soc'y Addiction Med. (Sept. 5, 2019), https://www.asam.org/quality-care/definition-of-addiction; *Your Words Matter – Language Showing Compassion and Care for Women, Infants, Families, and Communities Impacted by Substance Use Disorder*, NIDA (July 25, 2022), https://nida.nih.gov/nidamed-medical-health-professionals/health-professions-education/words-matter-language-showing-compassion-care-women-infants-families-communities-impacted-substance-use-disorder [hereinafter *Your Words Matter*].

holds greater stigma against SUDs than towards mental illnesses,[25] and seeks greater social distance from people with SUDs than from people who smoke or are obese.[26] A majority of the public believes that people with SUDs deserve a low priority in health care.[27] And 89% of people who know what methadone is think negatively of those who receive MOUD.[28]

These biases are especially true with respect to pregnant people who take methadone, like Ms. Lech. Studies show that parents with SUDs and women with SUDs incur higher rates of stigma than non-parents and men.[29] These negative perceptions compound with respect to pregnant people taking MOUD.[30] For

---

[25] Colleen L. Barry et al., *Stigma, Discrimination, Treatment Effectiveness, and Policy: Public Views About Drug Addiction and Mental Illness*, 65 Psychiatric Svs. 1269, 1270-71 (2014).

[26] Lindsay A. Phillips & Autherine Shaw, *Substance Use More Stigmatized Than Smoking and Obesity*, 18 J. Subst. Use 247 (2013).

[27] Jan Abel Olsen et al., *The Moral Relevance of Personal Characteristics in Setting Health Care Priorities*, 57 Soc. Sci. Med. 1163, 1165 (2003) (noting that participants were "most willing . . . to discriminate against substance users" as compared to other personal characteristics studied).

[28] Julia Woo et al.*, "Don't Judge a Book by Its Cover": A Qualitative Study of Methadone Patients' Experiences of Stigma*, 2017 Substance Abuse: Research & Treatment 1, 4.

[29] Andrea Weber et al., *Substance Use in Pregnancy: Identifying Stigma and Improving Care*, 13 Substance Abuse & Rehabilitation 105, 107 (2021); *see also* Jennifer J. Carroll et al., *The Harms of Punishing Substance Use During Pregnancy*, 98 Int'l J. of Drug Pol'y 1, 1 (2021) (same).

[30] Davida M. Schiff et al., *Assessing Stigma Towards Substance Use in Pregnancy: A Randomized Study Testing the Impact of Stigmatizing Language and Type of Opioid Use on Attitudes Toward Mothers with Opioid Use Disorder*, 16 J. Addiction Medicine 1, 7 (2022).

instance, in a 2022 study, most respondents felt that a pregnant person who received MOUD was "putting her baby in danger," one third felt that the person "should not be allowed to keep custody of her newborn," and more than half of the respondents felt that the person "had acted selfishly in becoming pregnant."[31]

Populations such as pregnant people with OUD who take MOUD that face such significant stigma are frequently discounted as not credible. Stigma itself has been defined as "an attribute that is deeply discrediting" whose "essential effect" is to cause the stigmatized person "to be discredited, and therefore dehumanized and disempowered."[32] As a result, scholars have emphasized that stigma "has a particularly profound effect on a person's attempt to seek remedial relief through civil litigation, and particularly in civil rights and discrimination claims where witness credibility is quite often the central issue for a fact finder to resolve."[33]

For instance, witnesses with mental illnesses often have their mental illness "used as a proxy for credibility" and are thus unfairly considered "untruthful."[34] In legal proceedings, the testimony of people with mental illness "is often severely

---

[31] *Id.*

[32] Deirdre M. Smith, *The Disordered and Discredited Plaintiff: Psychiatric Evidence in Civil Litigation*, 31 Cardozo L. Rev. 749, 809 (2010) (quoting Erving Goffman, Stigma: Notes on the Management of Spoiled Identity 3 (1963)).

[33] *Id.*

[34] Katherine M. Cole, *She's Crazy (to Think We'll Believe Her): Credibility Discounting of Women with Mental Illness in the Era of #MeToo*, 22 Geo. J. Gender & L. 173, 191 (2020).

discounted by factfinders," who "often allow prejudices about mental illnesses to interfere with an accurate weighing of the credibility of witnesses who have a history of mental illness."[35] Legal scholarship has likewise noted that witnesses living with HIV can "face insurmountable hurdles when trying to convince a jury of their credibility" given "the stigma still attached to being HIV positive . . . ."[36]

Stigma against people with SUDs similarly cultivates socially-prevalent stereotypes that people with SUDs are untruthful. According to the U.S. Department of Labor, "people with or in recovery from substance use disorder may be . . . perceived as untrustworthy, deceitful, dangerous, or lacking in willpower or

---

[35] Kevin M. Cremin et al., *Ensuring A Fair Hearing for Litigants with Mental Illnesses: The Law and Psychology of Capacity, Admissibility, and Credibility Assessments in Civil Proceedings*, 17 J. L. & Pol'y 455, 471 (2009).
[36] Sarah J. Newman, *Prevention, Not Prejudice: The Role of Federal Guidelines in HIV-Criminalization Reform*, 107 Nw. U. L. Rev. 1403, 1423 (2013); *see also* Sarah R. Christie, *AIDS, Employment, and the Direct Threat Defense: The Burden of Proof and the Circuit Court Split*, 76 Fordham L. Rev. 235, 269 (2007) (identifying a concern as "the potential for diminishing the plaintiff's credibility as a witness, a problem that is significantly exacerbated in a jury trial" and noting that "the stigma against HIV-positive individuals could be perpetuated in the courtroom").

character."[37] Within a stigmatized framework, the "'addict' is by definition—genetically, mentally, spiritually, incurably—a liar and a manipulator . . . ."[38]

Research confirms the widespread "practice of stereotyping people who use drugs as untrustworthy individuals."[39] Indeed, the stigma and associated stereotypes that people living with SUDs are not credible are so pernicious that they can even infect family members and SUD treatment providers. One study conducted in the Northeast found that participants who received methadone as treatment for MOUD were perceived by their own families as "untrustworthy due to stereotypes

---

[37] *Addressing Stigma*, U.S. Dep't Labor, https://www.dol.gov/agencies/eta/RRW-hub/Getting-started/Addressing-stigma (last accessed on June 17, 2023); *see also* Richard Balon, *Complexity of Reducing the Stigma of Mental Illness*, 47 Academic Psychiatry 95, 96 (2023) ("[P]eople with substance use disorders are viewed as having various negative personal characteristics, such as being cheaters, liars, reckless, unreliable, and lazy.").

[38] Carrie Wilens & Jeffrey Foote, *"Bad Parents," "Codependents," and Other Stigmatizing Myths About Substance Use Disorder in the Family, in* The Stigma of Addiction 33, 39 (Jonathan D. Avery & Joseph J. Avery eds., 2019); *see also id.* at 34 ("People with substance problems are labeled ('liars,' 'losers,' 'junkies,' 'addicts'), judged amoral and immoral, and rejected socially.").

[39] Nguyen Thu Trang et al., *How to Be Self-Reliant in a Stigmatising Context? Challenges Facing People Who Inject Drugs in Vietnam*, 87 Int'l J. Drug Pol'y 1, 11 (2021) (also citing research conducted within the United States).

surrounding drug use . . . ."[40] And a study of addiction counselors revealed that the participants "endorsed judgments like 'alcoholics are liars and cannot be trusted.'"[41]

## III. The Language Used to Describe People with OUD and other SUDs Significantly Affects How Others Perceive Them.

The language used to describe SUDs can magnify the existing biases described above. Specifically, phrases that characterize OUD and other SUDs as a moral failing—like "substance abuse"—obscure the fact that OUD is a disease and perpetuate negative perceptions of people living with OUD.

That is because "terms such as 'addict,' 'alcoholic,' 'abuser,' and 'junkie' maintain negative connotations,"[42] and can further "punitive judgments and perceptions that individuals with substance-related conditions are recklessly engaging in willful misconduct." [43] In other words, language can determine whether listeners think that an SUD is someone's fault as opposed to a medical condition

---

[40] Valerie Earnshaw, *Drug Addiction Stigma in the Context of Methadone Maintenance Therapy: An Investigation into Understudied Sources of Stigma*, 11 Int'l J. Mental Health & Addiction 110, 117 (2013).

[41] Wilens & Foote, *supra* note 38 at 40 (quoting Theresa B. Moyer & William R. Miller, *Therapists' Conceptualizations of Alcoholism*, 41 Psych. Addictive Behaviors 238, 242 (1993)).

[42] Karen Werder et al., *Addressing Bias and Stigma in the Language We Use with Persons with Opioid Use Disorder: A Narrative Review*, 28 J. Am. Psych. Nurses Ass'n 9, 11 (2022).

[43] John F. Kelly & Cassandra M. Westerhoff, *Does It Matter How We Refer to Individuals with Substance-Related Conditions? A Randomized Study of Two Commonly Used Terms*, 21 Int'l J. Drug Pol'y 202, 205 (2009); *see also Your Words Matter*, *supra* note 24 (noting that "[t]he term 'abuse' was found to have a high association with negative judgments and punishment").

beyond their control.[44] Referring to a person as an "addict" or "abuser" damagingly suggests that the person *is* the problem rather than the person *has* a problem.[45]

The power of language is especially potent with respect to pregnant people living with OUD. People often condemn pregnant women with OUD based on the misbelief that they are *choosing* to harm their baby.[46] The use of terms such as "addict," "abuser" or "user" perpetuates this misperception.[47] Inaccurately referring to a baby born with NAS as "addicted" compounds the stigma, as "[p]ortraying NAS babies as 'victims' results in the vilification of their mothers, who are then viewed as perpetrators."[48]

In this way, while the stigma against people living with OUD and other SUDs—including negative beliefs regarding their credibility and truthfulness—may

---

[44] Kelly & Westerhoff, *supra* note 43; *see also* Janet Zwick et al., *Stigma: How it Affects the Substance Use Disorder Patient*, 15 Substance Abuse Treatment, Prevention & Pol'y 1, 2 (2020) (noting that terms like "substance abuse problem," "substance abuser," or "abusing substances," carry an "emotional valence" to the audience).

[45] *Your Words Matter*, *supra* note 24.

[46] *Id.*

[47] *Id.*

[48] *A Collaborative Approach to the Treatment of Pregnant Women with Opioid Use Disorders*, SAMHSA 5 (2016), https://store.samhsa.gov/sites/default/files/d7/priv/sma16-4978.pdf (quoting *Open Letter Regarding Alarmist and Inaccurate Reporting on Prescription Opiate Use by Pregnant Women*, Int'l Drug Pol'y Consortium (Mar. 20, 2013), https://idpc.net/news/2013/03/open-letter-regarding-alarmist-and-inaccurate-reporting-on-prescription-opiate-use-by-pregnant-women)).

exist regardless of labeling, "the magnitude of the bias can in fact be manipulated via language choice."[49]

## ARGUMENT

### I.     Stigma Regarding Ms. Lech's SUDs Pervaded Her Trial.

Ms. Lech treated her OUD with MOUD throughout her incarceration at the WCC. JA325-26. Following the death of her baby and her release, she developed a dependence upon alcohol, which is another use disorder. JA503-04. The connections between Ms. Lech's SUDs and the issues presented at trial were, at best, highly tenuous. Nevertheless, defense counsel persistently raised Ms. Lech's use disorders, using language and strategies that fomented negative perceptions about people living with an SUD.

From the start, defense counsel invoked stigmatizing language and stereotypes about people with OUD that were not supported by medicine or science. For instance, counsel for Defendant Dorothea Von Goeler stated in his opening statement that "one of the things that you have to be concerned about in a woman who's pregnant who has had drug abuse and is now on methadone is that the baby, you have to worry about the baby's addiction to certain substances." Tr. at 55:3-55:9 (May 9, 2022). *But see supra*, Background, Parts I & III.

---

[49] Robert D. Ashford et al., *"Abusing Addiction": Our Language Still Isn't Good Enough*, 37 Alcohol Treatment Q. 1, 9 (2020).

This pattern continued throughout the trial with respect to all of Ms. Lech's SUDs. For example, during Ms. Lech's cross-examination, defense counsel repeatedly tied Ms. Lech's identity to her SUDs and characterized SUD as a choice, asking: "In this call . . . you spend some time describing for your brother how you *became an addict*, correct?" JA631 (emphasis added), "You did use cocaine as part of *your substance abuse*? Would you agree with that?" JA550 (emphasis added), and "[W]ere you *abusing alcohol*, at least in your mind, during that period of time?" JA835 (emphasis added). Defense counsel persisted in using this stigmatizing language when examining other witnesses. During the cross-examination of Ms. Lech's mother, counsel for Defendant Von Goeler asked whether Ms. Lech was— in defense counsel's words—"*abusing* alcohol" and "*abusing* drugs." Tr. at 113:24-114:18 (May 18, 2022) (emphasis added).

In addition to this problematic terminology, defense counsel also repeatedly asked foundationless questions that linked Ms. Lech's substance use to an alleged character for untruthfulness or an inability to function regularly in society. This strategy was especially pernicious because, even when Ms. Lech answered in the negative, her denial fed into defendants' primary argument that she was not credible. For instance, defense counsel asked Ms. Lech, "So when Mr. Giordano asked you earlier today about whether you purchased pills on the street and you answered no, was that a lie?" even though this mischaracterized her testimony. JA632.

In yet another example, during cross-examination of Ms. Lech regarding her tenure as a daycare teacher, counsel for Defendant Hampden County Sheriff's Department asked, without foundation, "So you were abusing drugs when you were working at the daycare?", which Ms. Lech denied. JA618. In response to Ms. Lech's testimony that working with children was challenging due to the loss of her wanted pregnancy, the same attorney asked, "So, as a result of your alcoholism is why you couldn't hold a job?" JA640. Once again, Ms. Lech answered in the negative. But these denials could not undo the harmful inferences created by defense counsels' strategy, which built a stigmatizing narrative around Ms. Lech that triggered implicit bias regarding her credibility in the minds of the jury.

## II. Ms. Lech's Inability to Present Evidence Corroborating Her Testimony Harmed Her Substantial Rights at Trial, Particularly Given Social Attitudes Towards the Credibility of People with SUD.

### A. Ms. Lech's Credibility Was Impeached at Trial and the Excluded Evidence Should Have Been Admitted to Rehabilitate Her.

The trial court abused its discretion when it determined that Ms. Lech's credibility had not been impeached as a basis for excluding Mr. Zygmont's testimony. Ms. Lech argues in her filings that Mr. Zygmont's testimony was admissible because, *inter alia*, the statements were non-hearsay under Federal Rule of Evidence 801(d)(1)(B)(i). Pl-Appellant's Br. at 19-30. Not only is Ms. Lech correct that these statements should have been admitted under subsection (B)(i), subsection (B)(ii) provides an additional independent basis for the admission of Mr.

Zygmont's testimony.[50] Specifically, because Ms. Lech's credibility as a witness was attacked and the excluded testimony would have added context demonstrating that Ms. Lech's testimony was credible, it should have been admitted under Rule 801(d)(1)(B)(ii).

### 1. The Amended Rule 801(d)(1)(B) Admits Prior Consistent Statements in Numerous Circumstances Where a Witness's Credibility Has Been Attacked.

In 2014, Congress expanded Rule 801(d)(1)(B), which governs the admission of declarant-witnesses' prior consistent statements. Previously, that section of the rule allowed for the admission of prior consistent statements only to rebut an express or implied charge of recent fabrication or improper influence or motive. *See* Fed. R. Evid. 801(d)(1)(B)(i). The amended rule now also allows for the admission of prior consistent statements "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B)(ii).[51]

"Rule 801(d)(1)(B)(ii) allows for the substantive use of prior consistent statements that are probative for rehabilitative purposes other than those specifically

---

[50] Ms. Lech preserved the argument that Mr. Zygmont's testimony was admissible under Rule 801(d)(1)(B)(ii). *See* JA146-48.

[51] Ms. Lech's briefing describes in detail that the threshold requirements – that she was cross-examined and that Mr. Zygmont's testimony was consistent with her own – were incontrovertibly established. Pl-Appellant's Br. at 19-22. *Amicus curiae* therefore focuses only on the requirement specific to subsection (B)(ii) – that the statement rehabilitate a witness's credibility where that witness was attacked on a ground other than fabrication. *See* Fed. R. Evid. 801(d)(1)(B)(ii).

enumerated in subsection (i)." *United States v. Purcell*, 967 F.3d 159, 196 (2d Cir. 2020) (citing Fed. R. Evid. 801, advisory committee's note). While this Court has not yet interpreted the amended subsection, the Second Circuit has emphasized that it "expands the purposes for which prior consistent statements may be offered," *id.*, and courts have admitted prior consistent statements under subsection (B)(ii) in far-ranging circumstances, including where:

- opening statements cast doubt on a witness' credibility, *United States v. Flores*, 945 F.3d 687, 705 (2d Cir. 2019) (prior consistent statement properly admitted where opening statement challenged a declarant-witness's memory, even though those challenges "were brief and were not their main challenges");

- cross-examination was designed to suggest the witness was biased, *United States v. Mitchell*, 2018 WL 6729792, at *3 (E.D. Va. Dec. 21, 2018);

- cross-examination "highlighted the aspects of [the witness'] . . . statements . . . that seemed most inconsistent with her trial testimony," *Purcell*, 967 F.3d at 197; and

- cross examination "clearly suggested" that the witness' testimony was not credible, *United States v. Ray*, 2022 WL 813942, at *2 (S.D.N.Y. Mar. 16, 2022).

Because (B)(ii) allows rehabilitation evidence in impeachment contexts beyond fabrication, there is no requirement of an exact match between the means of impeachment and the prior consistent statement. Rather, evidence is rehabilitative—and therefore admissible—if it tends to show that the witness' testimony is credible, in spite of the attack on credibility. For instance, in *United States v. Mitchell*, where opposing counsel suggested that the declarant-witness was biased against the

appellant and was therefore not credible, the court admitted testimony that corroborated the declarant-witness's claim that the appellant had spit on him. 2018 WL 6729792, at *3. Rather than require that the rehabilitation evidence demonstrate that the witness was *not biased*, the trial court correctly admitted evidence that *corroborated* the witness's testimony that he had been spit on, because that evidence tended to show that the witness was credible. In this way, when a witness's credibility is attacked, the broadened Rule 801(d)(1)(B) renders prior consistent statements that provide needed context to rehabilitate substantively admissible.

### 2. Defense Counsel Attacked Ms. Lech's Credibility as a Witness and the Excluded Evidence was Rehabilitative.

Under the proper application of Rule 801(d)(1)(B), the trial court erred when it excluded evidence based on the requirement that any rehabilitation evidence precisely rebut the defendants' impeachment of Ms. Lech. The court reasoned that it was not clear that "the topic on which the prior consistent statement would be offered had been raised on cross-examination." JA783. But there is no such prerequisite under subsection (B)(ii). All that is required is that Ms. Lech's credibility must have been attacked for a ground other than fabrication, and the proffered evidence must have rehabilitated her credibility. Both elements were satisfied.

First, defendants unambiguously mounted ceaseless attacks on Ms. Lech's character for truthfulness. Ms. Lech's merits brief exhaustively details how the

defendants argued that the phone call recordings supposedly demonstrated Ms. Lech's character for untruthfulness, not just with respect to what she said or did not say on the calls, but also with respect to her general credibility. *See, e.g.*, Pl-Appellant's Br. at 2, 10-11, 49. Indeed, as defendants argued in their own closing, "[I]f she'll lie to her mother and brother . . . wouldn't she also lie here where the stakes are a heck of a lot higher for her?" JA939. The court's ruling was particularly erroneous because it failed to appreciate defendants' systematic attack on Ms. Lech's credibility throughout the course of the trial through their repeated use of stigmatizing language to describe Ms. Lech's SUDs, and their repeated attempts to draw a line between Ms. Lech's SUDs and her credibility. *See supra* Argument, Part I; *see also Gomez v. Rivera Rodriguez*, 344 F.3d 103, 118 (1st Cir. 2003) ("[A] reviewing court must scrutinize the record as a whole and aggregate the collective effects of multiple errors.").

Second, Mr. Zygmont's testimony that Ms. Lech had shared with him her concerns about her health and the WCC's non-responsiveness around the same time as the phone calls would have rehabilitated Ms. Lech's character for truthfulness. Ms. Lech testified at trial that she experienced concerning physical symptoms and relayed those concerns to the defendants. JA431-37 448, 456, 462, 466. Defense counsel admitted phone calls to support the inference that because Ms. Lech did not discuss her symptoms or complaints on those calls, her trial testimony was false. But

Mr. Zygmont's testimony would have corroborated that Ms. Lech's testimony was in fact true by providing additional proof that Ms. Lech both had concerns about her pregnancy and relayed those concerns to WCC staff.

### B. The Trial Court's Improper Exclusion Affected Ms. Lech's Substantial Rights, Particularly Because as a Pregnant Person with SUDs Who Was Taking MOUD, She Was Acutely Vulnerable to Attacks on Her Credibility.

A new trial is required where "[t]he exclusion of the proffered testimony cannot be considered harmless," because the court "cannot say that its absence did not substantially affect the jury's decision . . . ." *Espeaignnette v. Gene Tierney Co*., 43 F.3d 1, 9 (1st Cir. 1994); *see* Fed. R. Civ. P. 61. Ms. Lech persuasively sets forth numerous reasons why the exclusion of Mr. Zygmont's testimony was not harmless, and why in the aggregate, all the alleged errors substantially affected Ms. Lech's rights. *See* Pl-Appellant's Br. at 48-52. In addition, the trial court's error was not harmless because as a pregnant person with SUDs who took MOUD, Ms. Lech was particularly susceptible to impeachment on the basis of challenging her character for truthfulness. *See Supra* Background, Part II. "[A] harmlessness determination demands a panoramic, case-specific inquiry." *United States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir. 1993). Here, such an analysis requires consideration of Ms. Lech's status as a pregnant person living with SUDs and receiving MOUD.

The voluminous research described above demonstrates both that the jury was predisposed to consider Ms. Lech untrustworthy as a result of the powerful stigma

against people with SUDs, and that these implicit biases were triggered throughout the trial by defense counsels' stigmatizing language and lines of questioning. Within the context of cross-examination, courts have overwhelmingly rejected attempts to question witnesses regarding prior substance use as improper under Federal Rules of Evidence 608 and 404 in light of these very concerns. *See, e.g.*, *United States v. Mojica*, 185 F.3d 780, 788-89 (7th Cir. 1999) (noting the "considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony," such that "a district court may refuse cross-examination on the issue where memory or mental capacity is not legitimately at issue and the evidence is offered solely as a general character attack"); *United States v. Carroll*, 53 F. App'x 785, 787 (7th Cir. 2002) (counsel cannot attack a witness's "credibility by asking the jury to infer that [the witness] should not be believed just because he is a person who has engaged in" drug use in the past); *Jenkins v. State*, 729 N.E.2d 147, 148 n.1 (Ind. 2000) (stating that "[a] witness' alleged prior drug use does not make her inherently more likely to commit perjury" and noting that to rule otherwise would run afoul of the rule against propensity evidence) (interpreting analogous state rule).[52] For the same reason, this Court

---

[52] *See also Stahl v. Haynes*, 2020 WL 5632510, at *15 (W.D. Wash. Sept. 21, 2020) (characterizing counsel's emphasis of a witness' addiction to an illegal substance as an "appeal to the prejudices of the jurors"); *Boatner v. Berryhill*, 2018 WL 2191804, at *9 (S.D. Miss. May 11, 2018) (reversing factual findings where "[u]nable to

should hold that Ms. Lech's inability to present much-needed rehabilitative evidence—in the face of the defendants' case theory that she had a character for untruthfulness—was especially harmful and requires a new trial.

Indeed, the trial court's evidentiary ruling risks reinserting the very bias against people living with OUD that the courts have sought to eradicate. Historically, courts determined that witnesses who used substances, particularly opiates or opioids, were not credible as a *per se* rule. For over a century, courts categorically denounced people with OUD as having a character for untruthfulness. *See, e.g.*, *State v. Fong*, 158 P. 233, 236 (Idaho 1916) ("[H]abitual users of opium, or other like narcotics, become notorious liars."); *Chicago & N.W. Ry. Co. v. McKenna*, 74 F.2d 155, 158-59 (8th Cir. 1934) ("[T]he defendants should have been permitted to show in cross-examination of appellee or otherwise that he was an habitual user of drugs and to develop by competent evidence the effect which continued addiction might have upon one's mental faculties, irrespective of whether he was under the immediate influence of the drug at the time of the occurrence. We think it had a direct bearing upon his credibility . . . .") (citation omitted); *Effinger v. Effinger*, 239 P. 801, 803 (Nev. 1925) ("The mental confusion and impairment of moral character

---

disqualify [the individual] directly for his drug addictions, the [factfinder] transmuted them into a credibility-destroying character flaw. This alchemy is beyond the [factfinder's] power").

produced by the habitual use of morphine, cocaine, or a like narcotic are established facts in medical research. That such use may be shown for the purpose of affecting the credibility of a witness is also well established.").

Ultimately, the courts recognized the inaccuracy—and damage—of this *per se* rule. Today, courts regularly acknowledge that "a drug addiction is not, by itself, admissible for the purposes of impeachment," *Walker v. Marsh*, 2022 WL 3598061, at *7 (E.D. Pa. Aug. 22, 2022), and that "the testimony of a drug addict is not automatically unreliable," *United States v. Baez-Acuna*, 125 F.3d 863, at *1 (10th Cir. 1997); *see also Godfrey v. United States*, 353 F.2d 456, 458 (D.C. Cir. 1965) (ordering new trial where "[t]he court instructed the jury that 'It is recognized that a drug addict is inherently a perjurer when his own interests are concerned and his testimony should be received with suspicion and acted upon with caution.'"). The trial court's exclusion of the important rehabilitation evidence enabled defendants' relentless attacks on Ms. Lech's credibility on the basis of her OUD to go unchecked, running counter to the judiciary's disavowal of automatically undermining the testimony of witnesses living with SUDs, and causing Ms. Lech significant harm.

## CONCLUSION

For these reasons, this Court should vacate the judgment below and order a new trial. The Court should further reverse the grant of summary judgment to Defendant Natalie Cruz, for the reasons stated in the plaintiff-appellant's filings.

Respectfully submitted,

*/s/ Jessie J. Rossman*

Jessie J. Rossman (1st Cir. No. 1208361)
Medha Swaminathan (1st Cir. No. 1208361)
Kirsten Mayer (1st Cir. No. 71971)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
mswaminathan@aclum.org
kmayer@aclum.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify as follows:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,327 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

June 23, 2023                                    */s/ Jessie J. Rossman*


## CERTIFICATE OF SERVICE

I certify that on this 23rd day of June 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit. I certify further that all participants in the case are registered CM/ECF users and that service will be accomplished through the appellate CM/ECF system.

June 23, 2023                                    */s/ Jessie J. Rossman*